IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN EDWARD PROCTOR,<br>as Personal Representative<br>of the Estate of Kenneth Bernard Proctor,<br>Deceased.<br>    8640 FAIRGROUNDS ROAD<br>    BEL ALTON, MD 20611<br><br>    Plaintiff,<br><br>    v.<br><br>HP ENTERPRISE SERVICES, LLC<br>    5400 LEGACY DRIVE<br>    PLANO, TX 75024<br>        SERVE:<br>    CT CORPORATION SYSTEM<br>    1015 15TH STREET, NW, SUITE 1000<br>    WASHINGTON, DC 20005<br><br>    AND<br><br>THE EXPERTS, INC.<br>    401 EAST LAS OLAS BLVD<br>    SUITE 1400<br>    FT. LAUDERDALE, FL 33301<br>        SERVE:<br>    ALEX ZALDIVAR<br>    401 EAST LAS OLAS BLVD<br>    SUITE 1400<br>    FT. LAUDERDALE, FL 33301<br><br>    Defendants. | Civil Action No. |

## COMPLAINT AND JURY DEMAND

Plaintiff John Edward Proctor ("John Proctor" or "Plaintiff"), as Personal Representative

of the Estate of his deceased son Kenneth Bernard Proctor, by counsel, brings this Complaint

against Defendants HP Enterprise Services, LLC ("HPES") and The Experts, Inc. ("The Experts"), and states as follows:

## NATURE OF THE CASE

This is a survival and wrongful death action arising from the tragic events that occurred on September 16, 2013, at the Washington Navy Yard in Washington, DC. On that date, Aaron Alexis (Alexis), a 34 year old ex-Navy government contractor working for The Experts pursuant to a contract with HPES, used his trusted position as a credentialed government contractor to enter the grounds of the Washington Navy Yard and use a shotgun to murder twelve people and injure three others in a deadly mass shooting.

Kenneth Bernard Proctor ("Bernard") was one of the innocent people whom Alexis murdered that day.

Plaintiff brings claims arising from Bernard's death pursuant to the Wrongful Death and Survival Acts of the District of Columbia, D.C. Code §§ 16-2701 and 12-101 respectively, for the negligent acts and omissions of HPES and The Experts which directly, proximately and foreseeably caused Bernard's wrongful death. Plaintiff brings claims against HPES and The Experts based on their own negligent acts and omissions, as well as based on their vicarious liability for Alexis's acts based on principals of *respondeat superior*.

## JURISDICTION AND VENUE

1.      Jurisdiction in this matter is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1). The matter in controversy in this matter exceeds the sum of $75,000 exclusive of interest and costs, and this matter is between citizens of different states. Plaintiff is a resident of Maryland, and Defendants are deemed citizens of Florida (The Experts) and Texas (HPES).

2

2.      Venue in this action properly lies in the United States District Court for the

District of Columbia pursuant to 28 U.S.C. § 1391(b)(2), insofar as a substantial part of the

events or omissions giving rise to this claim occurred in this district. Specifically, the shooting at

the center of this matter, which took Bernard's life, occurred within this district at the

Washington Navy Yard. Located in Washington, DC's southeast section, Washington Navy Yard

is owned by the United States and is home to Naval District Washington, Military Sealift

Command, Navy Sea Systems Command, Navy Band, Naval Criminal Investigative Service

Headquarters and the Naval Historical Center.

## THE PARTIES

3.      Plaintiff John Edward Proctor ("Plaintiff") is an adult resident of Maryland.

Plaintiff's address is 8640 Fairgrounds Road, Bel Alton, Maryland 20611.

4.      Plaintiff brings this action as the Personal Representative of the estate of his

deceased son Kenneth Bernard Proctor. Plaintiff qualified as the Personal Representative of the

Estate of Kenneth Bernard Proctor, for lawsuit purposes, on March 17, 2015, in the Orphan's

Court for Charles County, Maryland. The decedent, Kenneth Bernard Proctor, is survived by his

parents (John Proctor and Judy D. Proctor), three sisters, two brothers, and two children – B.J.

and K.P.

5.      The Experts, Inc. is a Florida Corporation organized under Chapter 607 Florida

Statute on June 29, 1998. The company headquarters is 401 East Las Olas Boulevard, Suite

1400, Fort Lauderdale, Florida. The Experts, Inc. has been a party to subcontracts with

Defendant HP Enterprise Services, LLC (HPES) providing services on HP-contracted projects

with the Department of Defense (DoD) and the United States Navy at the Washington Navy

3

Yard and throughout the world. The Experts, Inc. employed Aaron Alexis for six months in 2013 preceding his shooting of Kenneth Bernard Proctor.

6.      Defendant HPES is a Delaware limited liability company, with its headquarters at 5400 Legacy Drive, Plano TX 75024. HPES delivers services such as cloud computing, systems integration, network and systems operations, data center management, applications development, and outsourcing. HPES is one of the largest federal government contractors, and it also serves commercial customers in a wide range of industries, including energy, entertainment, health care, manufacturing, and transportation. Top clients have included the US Navy and former parent General Motors. HP Enterprise Systems (HPES) is a subsidiary of the Hewlett-Packard Company and operates as part of the HP Enterprises Business (HPES) segment.

7.      At all times material hereto, Defendant HPES had a contract with the Department of Defense (DoD) to provide services at locations including the Washington Navy Yard. Further, for six years preceding the Washington Navy Yard shooting, Defendant HPES had a subcontract with Defendant The Experts, to provide services to the Department of Defense (DoD) including the Washington Navy Yard.

## FACTS

### AARON ALEXIS HAD BEEN ARRESTED MULTIPLE TIMES PRIOR TO THE TIME HE WAS HIRED BY THE EXPERTS

8.      Prior to the time he was hired by The Experts, Aaron Alexis already had an arrest record that should have raised red flags with his employer regarding his fitness to work at a secure government facility such as the Washington Navy Yard.

9.      Alexis was arrested on June 3, 2004 by the Seattle Police Department and charged with felony "Malicious Mischief" after shooting out the rear tires of a construction worker's

4

vehicle in May. When interviewed by the police, he told them he had a "blackout" fueled by anger based upon his perception that the construction worker disrespected him.

10.     On August 10, 2008, while Alexis was serving in the United States Navy with Fleet Logistics Support Squadron 46 at Naval Air Station Joint Reserve Base Forth Worth, Alexis was again arrested, this time for Disorderly Conduct, in DeKalb County, Georgia. He was removed from a night club for causing damage to furnishings and, once outside, was disorderly and continued to yell profanities. He was jailed and issued a summons to appear in Court.

11.     On September 5, 2010, Alexis was arrested in Fort Worth, Texas, for discharging a firearm in his residence the previous day. The bullet allegedly traveled through the ceiling in Alexis' apartment into a neighbor's apartment. According to law enforcement documents, Alexis said he accidentally discharged the firearm while cleaning it.

12.     On December 2, 2010, Alexis requested separation from the Navy under the Enlisted Early Transition Program, a program that allowed certain enlisted members to separate within one year of the end of their obligated service. The Bureau of Naval Personnel approved Alexis' request for separation on December 9, 2010. At conclusion of his service, Alexis received an Honorable Discharge from the United States Navy with the re-entry code of RE-1 and was issued a Navy Reserve Identification and Privilege Card.

13.     The Experts, as Alexis's employer, should have uncovered Alexis's arrests during a pre-employment background check which should have included the collection of his arrest and criminal record.

## AARON ALEXIS'S RECORD WORKING WITH THE EXPERTS AND HPES RAISED RED FLAGS REGARDING ALEXIS WHICH WERE NOT REPORTED

14. On September 5, 2012, Alexis applied for employment as a technician with The Experts. The Experts was a subcontractor to HPES, a prime contractor performing work under the Navy's Navy-Marine Corps Intranet (NMCI) Continuity of Service Contract ("CoSC").

15. In spite of his multiple arrests, Alexis was hired in September 2012, as an employee by The Experts.

16. During the course of Alexis' work at The Experts, along with employees of The Experts he also worked closely with HPES. In particular, the HPES site manager closely supervised him.

17. The HPES contract on which The Experts worked was overseen by the Space and Naval Warfare Systems Command ("SPAWAR"), Program Executive Officer for Enterprise Information Systems ("PEO EIS"), and Naval Enterprise Networks Program Office, Warfare ("PMW 205"). The CoSC invokes the National Industrial Security Program Operating Manual ("NISPOM"), which defines the security requirements for cleared defense contractors.

18. DoD policy, which applied to The Experts and HPES, required commanders, heads of organization, and cleared contractors in the National Industrial Security Program (such as The Experts and HP Enterprise Services) to develop and maintain a program that ensures all pertinent derogatory information regarding cleared personnel is forwarded for consideration in the personnel security clearance determination process.

19. The DoD Central Adjudicative Facility ("CAF") is required to be notified of derogatory information through the Joint Personnel Adjudication System ("JPAS"), which is the DoD system of record for personnel security clearance adjudication and management. Derogatory information is conveyed via "incident reports" in JPAS.

20.     The Experts was a contractor approved by the Defense Security Service to engage in contracts with access to classified information.

21.     The Experts appointed a Facility Security Officer (FSO), reporting to the Chief Operating Officer (COO), with the responsibility to manage its security program.

22.     Under the NISPOM, Alexis' security eligibility was still valid because less than 24 months had lapsed since his separation from the Navy. Because Alexis had been cleared to access confidential information, conditions that could raise security concerns, such as emotional, mental, and personality disorders, a pattern of high risk, irresponsible, aggressive, antisocial, or emotionally unstable behavior and allegations of criminal conduct, regardless of whether he was formally charged, should have been reported to the CAF.

23.     The Experts' FSO recorded in JPAS that Alexis was an active employee of The Experts requiring access to classified information.

24.     Separate from the government security requirements, HPES required The Experts to conduct pre-employment suitability checks on individuals assigned to CoSC, which involved a drug test, a motor vehicle driving record check, and criminal convictions checks.

25.     On September 6, 2012, HPES resource management personnel authorized 28 of The Experts' technicians, including Alexis, to begin work prior to receiving the results of their criminal convictions check. From September 10, 2012, until December of 2012, Alexis worked under the CoSC, providing services at six project sites in Texas, California, and Japan. He resigned on December 27, 2012.

26.     A little over six months later, on June 27, 2013, Alexis re-applied to The Experts as a technician. Since The Experts' FSO had not removed Alexis' access to classified information within JPAS following his resignation, The Experts took no further actions relative

to Alexis' eligibility for access to classified information. The Experts repeated the drug test and pre-employment background checks required by HPES.

27.     On information and belief, The Experts background check failed to uncover Alexis's prior arrest record and were insufficient.

28.     From July to September 2013, The Experts assigned Alexis work in several locations, including Virginia, Rhode Island and Maryland. During this time, Alexis' conduct became very erratic and raised clear red flags to all those he came in contact with at The Experts and HPES.

29.     On August 4, 2013, Alexis traveled from Norfolk, Virginia, to Providence, Rhode Island, on assignment to the Naval Undersea Warfare Center (NUWC) at Naval Station Newport.

30.     On August 4, 2013, while Alexis was at the Norfolk airport awaiting a flight to Providence, he called The Experts' project coordinator for the CoSC to say that a male, seated across the aisle from him, was making fun of him. Alexis said he was getting angry at the individual. In a 20-minute phone call, the project coordinator calmed Alexis down, instructed him to get away from the person, and to seek help from airport security. The next morning, the project coordinator reported Alexis' call to The Experts CoSC program team.

31.     On August 5, 2013, Alexis contacted The Experts' travel coordinator seeking assistance in moving from the Residence Inn, in Middletown, Rhode Island, to the Navy Gateway Inns & Suites on Naval Station Newport because of noisiness at the Residence Inn.

32.     On August 6, 2013, at around 2:00 am, the Naval Station Newport Police Department received the first of four calls (2:00 am, 9:18 pm, 10:16 pm; and August 7 at 2:54 am) from and about Alexis at the Navy Gateway Inns & Suites. The calls and subsequent

8

interactions involved noise complaints from Alexis and neighboring guests at the Navy Gateway
Inns & Suites.

33.     In one instance, the front desk clerk at the Navy Gateway Inns & Suites *requested
that Naval Station Newport Police keep an officer close to the Navy Gateway Inns & Suites in
case Alexis hurt someone.*

34.     This request was based on a *phone call from The Experts' travel coordinator to
the Navy Gateway Inns & Suites expressing concern that Alexis may harm others.*

35.     When the officers responded to the Navy Gateway Inns & Suites, they learned
that Alexis had taken apart his bed, believing someone was hiding under it, and observed that
Alexis had taped a microphone to the ceiling to record the voices of people that were "following"
him.

36.     The Naval Station Newport Police Officers did not place Alexis in protective
custody. During a later interaction at 9:18 pm with other Naval Station Newport Police Officers,
Alexis mentioned a "chip" in his head and "microwave signals".

37.     On August 6, 2013, around 6:00 pm, Alexis reported to The Experts' travel
coordinator that two men and one female had followed him from the Residence Inn to the Navy
Gateway Inns & Suites. Alexis reported that three people were talking about him through the
walls of the adjacent room and were using a machine to keep him awake. The machine was
allegedly an ultrasonic device that Alexis said was physically pinning him to the bed. Later that
same evening, Alexis made a similar report to The Experts' program manager for CoSC.

38.     On August 6, 2013, around 8:45 pm, during a call from The Experts' travel
coordinator, the desk clerk at the Navy Gateway Inns & Suites read the desk log that
documented: Alexis disrupting other guests in the early morning hours of August 6, 2013, by

knocking on walls and asking people to stop making noise; and that Security had talked to Alexis and noted that Alexis had "disheveled the bed." The travel coordinator gave her contact information and that of The Experts' program manager to the desk clerk.

39.     The Navy Gateway Inns & Suites desk log included the following entry at 8:45 pm on August 6, 2013: "[Travel coordinator's full name] called regarding PO3 Alexis, [Alexis] called her explaining that three people followed him from The Residence Inn when he was moved over here, he told her they keep yelling at him & following him. Call her if you have any questions or concerns. *She is very worried & is afraid he can harm others.* Her # is XXX-XXX-XXXX or [Program Manager's first name] who is the other manager her # is XXXXXX-XXXX."

40.     On August 6, 2013, after completing the 8:45 pm call with the desk clerk at Navy Gateway Inns & Suites, the travel coordinator called The Experts' program manager of CoSC to report the information gathered.

41.     On August 6, 2013, late evening, the program manager of CoSC, her immediate manager, and the FSO held a conference call to discuss the reports concerning Alexis. The management team concluded that Alexis should leave Newport and return to Fort Worth because they were concerned about his behavior.

42.     On August 6, 2013, late in the evening, The Experts' program manager had a telephone conversation with Alexis regarding removal from the Newport assignment to return to Fort Worth, for rest. Alexis said he wanted to stay and work.

43.     On August 6, 2013, at 11:35 pm, the FSO, using the Joint Clearance Access Verification System tool within JPAS (which is used to pass clearance information on visitors to

various sites and make visit requests), cancelled the visit notification for Alexis that the FSO previously established for access to NUWC.

44.     On August 7, 2013, at 1:12 am, The Experts' program manager sent an email to HPES representatives and The Experts' CoSC team stating Alexis was not feeling well and would not complete the work assignment at Newport. She also booked airline tickets for Alexis' return to Fort Worth.

45.     On August 7, 2013, at about 3:00 am, Alexis called the HPES second shift deployment supervisor asking to stay in her room at the Marriott, in Newport, because he had to move out of his room. He believed some people had followed him to the Navy Gateway Inn & Suites. Alexis had previously worked with this supervisor in Japan. She agreed to let him stay in her room.

46.     Upon arrival, Alexis told the HPES second shift deployment supervisor that three people, who traveled on the plane with him from Norfolk, and had checked into the same hotel as Alexis did, began making noise and threats against him.

47.     Alexis also said those same people had followed him from one hotel to another and were now checked into the room below the HPES second shift deployment supervisor's room. Alexis asked her, "Can't you hear that?" The second shift deployment supervisor said she did not hear anything and told Alexis so. The HPES second shift deployment supervisor thought his story was "preposterous" and went back to bed. Alexis called the City of Newport police to report the people he thought were following him.

48.     On August 7, 2013, around 6:20 am, the City of Newport Police responded to a call from Alexis at the Marriott, regarding a report of harassment. Alexis described to the responding officers an earlier verbal altercation with an unknown party at the Norfolk Airport.

11

49.     Alexis told the officers that this party had sent three people to follow him and to keep him awake by talking to him and sending vibrations into his body. Alexis reported first hearing them through the wall while at the Residence Inn in Middletown, Rhode Island. Alexis informed the officer that the three individuals were now speaking to him through the walls, floor, and ceiling. Alexis said that the individuals were using "some sort of microwave machine" to send vibrations through the ceiling, and that these vibrations were penetrating his body such that he could not sleep.

50.     The police took Alexis' report and left the hotel.

51.     On August 7, 2013, around 9:30 am, the Newport Police Officer-in-Charge contacted the on-duty Naval Station Police Sergeant and advised her of Alexis' claims.

52.     The City of Newport Police Department faxed a copy of its Police Report to the Naval Station Newport Security Office with the following note: *"FYI on this. Just thought to pass it on to you in the event this person escalates."*

53.     On August 7, 2013, around 10:00 am to 10:30 am, the HPES second shift deployment supervisor awoke and left her room to call the HPES lead supervisor working at NUWC to inform him of the events from earlier in the morning with Alexis. The HPES lead deployment supervisor told her that The Experts had already issued an email early that morning saying Alexis was not feeling well and would be removed from the Newport project team.

54.     The HPES second shift deployment supervisor, after making the report, returned to her room and woke Alexis.

55.     Alexis told the HPES second shift deployment supervisor the people following him had now checked into the room above them. Alexis said the people were trying to disrupt his sleep and he wanted to acquire a radar gun in order to hear what they were saying.

56.     On August 7, 2013, at 11:39 pm, The Experts' FSO entered a "Debrief" action in JPAS. A debrief entry records an administrative decision that the individual no longer requires access to classified information and was entered by the FSO as another means of preventing Alexis' access to NUWC. A 'debrief' does not convey any concern about Alexis' reliability.

57.     On August 7, 2013, after having lunch with Alexis, the HPES second shift deployment supervisor reported to the NUWC jobsite and informed the HPES lead supervisor for the second time about the visit from Alexis and her discussions with him. The HPES second shift deployment supervisor subsequently told a HPES co-worker about her encounter with Alexis.

58.     On August 7, 2013, early in the afternoon, The Experts' human resources (HR) director engaged legal counsel and initiated an investigation into the information about Alexis, including contacting police departments.

59.     On August 7, 2013, The Experts program manager called the HPES second shift deployment supervisor. The HPES supervisor said that Alexis had left the Navy Gateway Inns & Suites in the early morning hours of August 7, 2013, to stay in her room at Marriott Hotel in Newport because of the noise people were making.

60.     On August 7, 2013, mid-afternoon, The Experts' HR Director contacted the Middletown, Rhode Island, Police Department to collect any police reports regarding Alexis. The Experts' HR Director believed that the Middletown Police Department provided police coverage for all of the hotels in which Alexis resided while in Newport, Rhode Island. There were no police reports found with Middletown Police Department.

61.     On August 7, 2013, Alexis departed Newport, staying the night at the Best Western Hotel, Providence airport. On August 8, 2013, he travelled from Providence airport to the Dallas-Fort Worth, Texas airport.

62.     On August 9, 2013, The Experts HR director called Alexis' mother who said that Alexis had been paranoid and this was not the first episode he had experienced.

63.     On August 9, 2013, in the early afternoon, The Experts' CoSC management team, including the HR director and FSO, discussed actions that should be taken regarding Alexis. The Experts concluded Alexis should rest before being reassigned to another CoSC deployment.

64.     The Experts reportedly considered whether to file an adverse information report concerning Alexis to the CAF. FSOs are required to submit adverse information reports directly to CAF through the JPAS continuous evaluation incident report feature.

65.     The Experts' CoSC management team reportedly concluded that the information collected about Alexis was based on rumor and innuendo, and therefore a report to the government should not be made, since doing so may infringe on Alexis' privacy rights.

66.     Following The Experts' decision to return Alexis to a work status, the FSO, on August 9, 2013 at 2:55 pm, recorded in JPAS an "indoctrination" action. This action reestablished Alexis as an individual authorized access to classified information under the cognizance of The Experts.

67.     Between August 12, 2013, and September 6, 2013, The Experts assigned Alexis as follows: Williamsburg, Virginia, from August 12-16, 2013; Newport, Rhode Island, from August 19-23, 2013; Carderock, Maryland, from August 26-30, 2013; Crystal City, Virginia, from September 3-6, 2013.

68.     On September 1, 2013, Alexis exchanged several emails with the president of Freedom from Covert Harassment and Surveillance discussing, "constant bombardment from some type of ELF weapon," that had "almost cost him his job."

69.     On September 9, 2013, The Experts assigned Alexis to work at the Washington Navy Yard. Alexis started working there that week. During the week of September 9, 2013, other than leaving a disk in a classified computer, no performance issues were noted. Preparations for his attack started very quickly.

**PREPARATION AND THE ATTACK**

70.     On September 14, 2013, Alexis purchased a Remington 870 12-gauge shotgun and ammunition at a gun shop in Lorton, Virginia. He also purchased a hacksaw and other items at a home improvement store in Northern Virginia, using the hacksaw to modify the shotgun for concealment. Alexis carved into the gun the words "my ELF weapon" and "end to the torment!" ELF refers to "extremely low-frequency" in Navy submarine communications.

71.     On September 16, 2013, Alexis went on his rampage.

72.     At 7:44 am on the morning of September 16, Alexis arrived at the Washington Navy Yard 6th Street gate, and used his valid CAC and building pass to enter.

73.     As Alexis's cleared government contractor, The Experts had used the JPAS computer system of the DoD CAF to schedule Alexis to work at the Washington Navy Yard on September 16, 2013. By scheduling this visit, The Experts caused a building visitation pass to be issued to Alexis which, together with his valid CAC card, was all he needed to obtain proper and legal access to the Washington Navy Yard.

74.     At 8:02 am, Alexis entered the Building 197 lobby using the electronic badge reader farthest away from the contract security guard station with a bag and carrying a concealed shotgun and ammunition. He used a valid temporary building pass for entry.

75.     The pass that Alexis used to enter the building was provided to him by The Experts to use during the visit that The Experts had secured for him.

76.     At approximately 8:15 am, Alexis exited the 4th floor bathroom and began

shooting people. Over the course of about one hour Alexis used the Remington 870 shotgun and

a Beretta handgun he had obtained to kill 12 individuals and wound 4 others before he was shot

and killed by responding law enforcement officers.

77.     Bernard was one of those killed by Alexis. He eventually died after being shot by

Alexis in the head. On the date of his death, Bernard was a 46-year-old civilian utilities

operations supervisor and had been at the Navy Yard for 22 years.

78.     He did not work in Building 197, where the shooting occurred, but was present in

the building because that was where he typically got breakfast and, until its fateful ending, that

day was like any other.

### THE RISK OF AN ATTACK AT THE NAVY YARD WAS HIGHLY FORESEEABLE

79.     As of September, 2013, the risk that an insider would attempt to use valid entry

credentials to mount a deadly attack at the Washington Navy Yard was particularly foreseeable

due to the fact that it had just happened, only recently, in similar military installations: In 2009

Major Nidal Hasan shot and killed 13 people and wounded 43 others in Fort Hood, Texas, and in

2012 Specialist Ricky Elder fatally shot his battalion commander and then turned the gun on

himself. Due to the history of violent acts by insiders on government installations, the

Defendants were on notice of this particular risk.

80.     Additionally, there were attacks at the Washington Navy Yard, specifically, prior

to Alexis' attack: the first in 1983 when a Puerto Rican separatist group set off a bomb in a

computer center; the second in 1984 when a bomb was set off in the Washington Navy Yard

Officer's Club.

81.     Mass shootings at other venues, which have become increasingly common in recent years, also put Defendants on notice of the particular threat that a person like Alexis could "escalate" and commit violent acts. To mention just two of the most recent examples leading up to the time of Alexis' attack: the elementary school shooting in Sandy Hook, CT (just 125 miles from Newport, Rhode Island, where many of the red-flag events described in this case occurred) in which 20 students and six staff members were shot, as well as the movie theater shooting in Aurora, Colorado, had both occurred during 2012 and were both fresh in the national consciousness. A more comprehensive list is catalogued at the Los Angeles Times website, as part of an article entitled Deadliest U.S. mass shootings.[1]

## BREACHES OF THE STANDARD OF CARE

82.     Prior to his entry into the Navy and continuing until his rampage, Alexis exhibited a pattern of high-risk, aggressive, antisocial and emotionally unstable behavior. This behavior included arrests for violent acts as well as increasing escalation of warning signs during the weeks and months preceding his attack. Alexis further demonstrated a pattern of criminal activity that created doubt about his judgment, reliability, and trustworthiness.

83.     The Experts and HPES breached applicable duties of care by negligently hiring, retaining, and supervising Alexis who was unfit for his duties and unfit to work at the Navy Yard.

84.     The Experts and HPES breached applicable duties of care by failing to investigate, report, recognize and/or act on any of the multiple independent factors indicating Alexis was a dangerous individual whose ultimate actions were particularly foreseeable.

---

[1]     Available here: http://timelines.latimes.com/deadliest-shooting-rampages/ (last accessed 9/4/2015). Plaintiff incorporates by reference the facts contained in this article into his Complaint.

85.     The Experts and HPES breached applicable duties of care by failing to create incident reports in JPAS regarding the multiple red flag events that occurred in August.

86.     The Experts and HPES breached applicable duties of care by negligently assigning Alexis to work at the Washington Navy Yard and securing his access to the facility where he undertook his rampage. But for Alexis' position at The Experts and as a subcontractor to HPES, he would not have been able to access Building 197 and commit his violent acts.

87.     The Experts and HPES failed to warn DoD CAF of the risk that Alexis would commit a criminal act.

88.     The aforementioned breaches proximately caused Decedent's death.

89.     As a result of Defendants' breaches of the standard of care, and wrongful conduct described, Alexis was permitted access to the Navy Yard in spite of the numerous red-flags that were known to The Experts and HPES (and which made Alexis' criminal conduct particularly foreseeable) while carrying the unlawful firearms that were ultimately used to massacre Navy Yard personnel, including Bernard.

## COUNT I
### Wrongful Death: Negligent Hiring, Retention, Supervision, and Training
### (Against the Experts)

90.     All prior paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

91.     This claim for wrongful death is brought by John Proctor, as personal representative of decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 16-2701.

92.     The Experts had a duty to use reasonable care to select employees who are competent and fit for the work assigned to them, and to refrain from using the services of an incompetent or unfit employee.

18

93.     Prior to and at the time of the incident, Alexis was an employee of The Experts.

94.     The Experts knew, or in the exercise of reasonable care should have known, that Alexis posed a foreseeable risk of harm and/or death to the safety of third parties.

95.     Specifically, The Experts became aware of facts demonstrating that Alexis was "unstable," was acting strangely, and which taken together strongly indicated that he posed a risk to the safety of third parties. However, instead of taking any steps to eliminate Alexis from harming others, they covered up the issue, and sent him to work at the Navy Yard where his violent massacre unfolded.

96.     The risk that Alexis would commit a violent criminal act and harm others was obvious enough that it was explicitly acknowledged in this instance by many of those who came into contact with Alexis. For example, on August 6 and 7, multiple persons appeared concerned that Alexis would commit a criminal act. On August 6, The Experts' travel coordinator called the Navy Gateway Inns & Suites expressed *concern that Alexis may harm others*, and this information spurred the clerk to call the police. Additionally, after hearing reports of Alexis' behavior, CoSC's Program Manager, her immediate manager, the FSO had a call and concluded that Alexis should leave Newport because they were "concerned about his behavior." In spite of this knowledge, The Experts program manager merely covered up the issue by reporting instead that Alexis was "not feeling well."

97.     On August 7, Newport police contacted the on-duty Naval Station Police Sergeant and advised her of Alexis's claims, and faxed a copy of its police report to the Naval Station Newport Security Office with the note: "FYI on this. Just thought to pass it on to you *in the event this person escalates*."

98.      As stated on page 3 of the **Findings** of the Navy Department's Report of the

Investigation Into the Fatal Shooting Incident at the Washington Navy Yard on September 16,

2013, and Associated Security, Personnel, and Contracting Policies and Practices report, issued

November 8, 2013: "Before September 16th, Alexis *was observed by several people, including*

*his supervisors at The Experts, Inc, and HP Enterprise Services LLC, to behave in a way that*

*raised concerns about his mental stability and presented indicators that he may cause harm to*

*others.*"

99.      The fact that Alexis could escalate and commit a criminal act and harm others was

particularly foreseeable given his conduct.

100.     Alexis was unfit and incompetent to work at the Navy Yard.

101.     By hiring Alexis, retaining him as an employee, improperly supervising him, and,

in fact, sending Alexis to work at the Navy Yard, The Experts breached its duty of care.

102.     Alexis' unfitness and/or incompetence for employment resulted in, *inter alia*, his

murder of Kenneth Bernard Proctor.

103.     The Experts' negligence in hiring, supervising, assigning, and retaining of Alexis

was a substantial factor in causing the death of Kenneth Bernard Proctor.

104.     Kenneth Bernard Proctor's death was a direct and proximate result of the

aforesaid negligent acts and/or omissions of The Experts.

105.     Kenneth Bernard Proctor acted properly in all respects and was free from

negligence in connection with this incident.

106.     As a direct and proximate result of Defendant's negligent acts and/or omissions,

decedent's statutory beneficiaries have suffered financial loss, loss of gifts, contributions,

services, care, and support of decedent, and incurred medical expenses, funeral services and expenses, and other losses and damages, which shall be proven at trial.

**WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of decedent, Kenneth Bernard Proctor, demands judgment against Defendant, as follows: (1) compensatory damages in the amount of not less than $20,000,000.00, which amount will be proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

## COUNT II
### Survival Action: Negligent Hiring, Retention, Supervision, and Training
### (Against The Experts)

107.    All prior paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

108.    This survival action is brought by John Proctor, as personal representative of decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 12-101, and is brought on behalf of the decedent's estate. Mr. Proctor was appointed decedent's personal and legal representative on March 17, 2015.

109.    The Experts had a duty to use reasonable care to select employees who are competent and fit for the work assigned to them, and to refrain from using the services of an incompetent or unfit employee.

110.    Prior to and at the time of the incident, Alexis was an employee of The Experts.

111.    The Experts knew, or in the exercise of reasonable care should have known, that Alexis posed a foreseeable risk of harm and/or death to the safety of third parties.

112.    Specifically, The Experts became aware of facts demonstrating that Alexis was "unstable," was acting strangely, and which taken together strongly indicated that he posed a risk

to the safety of third parties. However, instead of taking any steps to prevent Alexis from harming others, they covered up the issue, and sent him to work at the Navy Yard where his violent massacre unfolded.

113.    The risk that Alexis would commit a violent criminal act and harm others was obvious enough that it was explicitly acknowledged in this instance by many of those who came into contact with Alexis. For example, on August 6 and 7, multiple persons were concerned that Alexis would commit a criminal act. On August 6, The Experts' travel coordinator called the Navy Gateway Inns & Suites expressed *concern that Alexis may harm others*, and this information spurred the clerk to call the police. Additionally, after hearing reports of Alexis' behavior, CoSC's Program Manager, her immediate manager, the FSO had a call and concluded that Alexis should leave Newport because they were "concerned about his behavior." In spite of this knowledge, The Experts program manager merely covered up the issue by reporting instead that Alexis was "not feeling well."

114.    On August 7, Newport police contacted the on-duty Naval Station Police Sergeant and advised her of Alexis's claims, and faxed a copy of its police report to the Naval Station Newport Security Office with the note: "FYI on this. Just thought to pass it on to you *in the event this person escalates*."

115.    As stated on page 3 of the **Findings** of the Navy Department's Report of the Investigation Into the Fatal Shooting Incident at the Washington Navy Yard on September 16, 2013, and Associated Security, Personnel, and Contracting Policies and Practices report, issued November 8, 2013: "Before September 16th, Alexis *was observed by several people, including his supervisors at The Experts, Inc, and HP Enterprise Services LLC, to behave in a way that*

*raised concerns about his mental stability and presented indicators that he may cause harm to others.*"

116.    The fact that Alexis could escalate and commit a criminal act and harm others was particularly foreseeable given his conduct.

117.    Alexis was unfit and incompetent to work at the Navy Yard.

118.    By hiring Alexis, retaining him as an employee, improperly supervising him, and, in fact, sending Alexis to work at the Navy Yard, The Experts breached its duty of care.

119.    Alexis' unfitness and/or incompetence for employment resulted in his murder of Kenneth Bernard Proctor.

120.    The Experts' negligence in hiring, supervising, assigning, and retaining of Alexis was a substantial factor in causing the death of Kenneth Bernard Proctor.

121.    Kenneth Bernard Proctor's death was a direct and proximate result of the aforesaid negligent acts and/or omissions of The Experts.

122.    Kenneth Bernard Proctor acted properly in all respects and was free from negligence in connection with this incident.

123.    As a direct and proximate result of the negligence by Defendant and/or Defendant's employees and/or agents, and through no fault of his own, decedent, Kenneth Bernard Proctor, suffered extreme conscious physical pain and bodily injury, disfigurement, and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish prior to his untimely and horrific death.

124.    As a further direct and proximate result of the negligence by Defendant and/or Defendant's employees and/or agents, decedent, Kenneth Bernard Proctor, suffered past and future lost income, lost earnings, and loss of earning capacity.

**WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of decedent, Kenneth Bernard Proctor, demands judgment against Defendant, as follows: (1) compensatory damages in the amount of not less than $20,000,000.00, which amount will be proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

## COUNT III
### Wrongful Death: Negligent Hiring, Retention, Supervision, and Training (Against HPES)

125.    All prior paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

126.    This claim for wrongful death is brought by John Proctor, as personal representative of decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 16-2701.

127.    HPES had a duty to use reasonable care to select contractors who are competent and fit for the work assigned to them, and to refrain from using the services of an incompetent or unfit contractor.

128.    Alexis was a subcontractor to HPES, through its contract with The Experts.

129.    HPES knew, or in the exercise of reasonable care should have known, that Alexis posed a foreseeable risk of harm and/or death to the safety of third parties.

130.    Specifically, HPES became aware of facts demonstrating that Alexis was "unstable," was acting strangely, and which taken together strongly indicated that he posed a risk to the safety of third parties. However, instead of taking any steps to eliminate Alexis from harming others, they allowed him to work at the Navy Yard where his violent massacre unfolded.

24

131.    The risk that Alexis would commit a violent criminal act and harm others was obvious enough that it was explicitly acknowledged in this instance by many of those who came into contact with Alexis. For example, on August 6 and 7, multiple persons appeared concerned that Alexis would commit a criminal act. On August 6, The Experts' travel coordinator called the Navy Gateway Inns & Suites expressed *concern that Alexis may harm others*, and this information spurred the clerk to call the police. Additionally, after hearing reports of Alexis' behavior, CoSC's Program Manager, her immediate manager, the FSO had a call and concluded that Alexis should leave Newport because they were "concerned about his behavior." In spite of this knowledge, The Experts program manager merely covered up the issue by reporting instead that Alexis was "not feeling well."

132.    On August 7, Newport police contacted the on-duty Naval Station Police Sergeant and advised her of Alexis's claims, and faxed a copy of its police report to the Naval Station Newport Security Office with the note: "FYI on this. Just thought to pass it on to you *in the event this person escalates*."

133.    As stated on page 3 of the **Findings** of the Navy Department's Report of the Investigation Into the Fatal Shooting Incident at the Washington Navy Yard on September 16, 2013, and Associated Security, Personnel, and Contracting Policies and Practices report, issued November 8, 2013: "Before September 16th, Alexis *was observed by several people, including his supervisors at The Experts, Inc, and HP Enterprise Services LLC, to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others.*"

134.    The fact that Alexis could escalate and commit a criminal act and harm others was particularly foreseeable given his conduct.

135.   HPES became aware of these incidents before Alexis's rampage.

136.   Alexis was unfit and incompetent to work at the Navy Yard.

137.   By retaining Alexis as a contractor and allowing Alexis to work at the Navy Yard, HPES breached its duty of care.

138.   Alexis' unfitness and/or incompetence resulted in his murder of Kenneth Bernard Proctor.

139.   HPES's negligence in supervising, assigning, and retaining of Alexis was a substantial factor in causing the death of Kenneth Bernard Proctor.

140.   Kenneth Bernard Proctor's death was a direct and proximate result of the aforesaid negligent acts and/or omissions of HPES.

141.   Kenneth Bernard Proctor acted properly in all respects and was free from negligence in connection with this incident.

142.   As a direct and proximate result of Defendant's negligent acts and/or omissions, decedent's statutory beneficiaries have suffered financial loss, loss of gifts, contributions, services, care, and support of decedent, and incurred medical expenses, funeral services and expenses, and other losses and damages, which shall be proven at trial.

**WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of decedent, Kenneth Bernard Proctor, demands judgment against the Defendant, as follows: (1) compensatory damages in the amount of not less than $20,000,000.00, which amount will be proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

**COUNT IV**
**Survival Action: Negligent Hiring, Retention, Supervision, and Training**
**(Against HPES)**

26

143.    All prior paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

144.    This survival action is brought by John Proctor, as personal representative of decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 12-101, and is brought on behalf of the decedent's estate. Mr. Proctor was appointed decedent's personal and legal representative on March 17, 2015.

145.    HPES had a duty to use reasonable care to select contractors who are competent and fit for the work assigned to them, and to refrain from using the services of an incompetent or unfit contractor.

146.    Alexis was a subcontractor to HPES, through its contract with The Experts.

147.    HPES knew, or in the exercise of reasonable care should have known, that Alexis posed a foreseeable risk of harm and/or death to the safety of third parties.

148.    Specifically, HPES became aware of facts demonstrating that Alexis was "unstable," was acting strangely, and which taken together strongly indicated that he posed a risk to the safety of third parties. However, instead of taking any steps to eliminate Alexis from harming others, they allowed him to work at the Navy Yard where his violent massacre unfolded.

149.    The risk that Alexis would commit a violent criminal act and harm others was obvious enough that it was explicitly acknowledged in this instance by many of those who came into contact with Alexis. For example, on August 6 and 7, multiple persons appeared concerned that Alexis would commit a criminal act. On August 6, The Experts' travel coordinator called the Navy Gateway Inns & Suites expressed *concern that Alexis may harm others*, and this information spurred the clerk to call the police. Additionally, after hearing reports of Alexis'

behavior, CoSC's Program Manager, her immediate manager, the FSO had a call and concluded that Alexis should leave Newport because they were "concerned about his behavior." In spite of this knowledge, The Experts program manager merely covered up the issue by reporting instead that Alexis was "not feeling well."

150.    On August 7, Newport police contacted the on-duty Naval Station Police Sergeant and advised her of Alexis's claims, and faxed a copy of its police report to the Naval Station Newport Security Office with the note: "FYI on this. Just thought to pass it on to you *in the event this person escalates*."

151.    As stated on page 3 of the **Findings** of the Navy Department's Report of the Investigation Into the Fatal Shooting Incident at the Washington Navy Yard on September 16, 2013, and Associated Security, Personnel, and Contracting Policies and Practices report, issued November 8, 2013: "Before September 16th, Alexis *was observed by several people, including his supervisors at The Experts, Inc, and HP Enterprise Services LLC, to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others.*"

152.    The fact that Alexis could escalate and commit a criminal act and harm others was particularly foreseeable given his conduct.

153.    Alexis was unfit and incompetent to work at the Navy Yard.

154.    By retaining Alexis as a contractor and allowing Alexis to work at the Navy Yard, HPES breached its duty of care.

155.    Alexis' unfitness and/or incompetence resulted in his murder of Kenneth Bernard Proctor.

156.    HPES's negligence in supervising, assigning, and retaining of Alexis was a substantial factor in causing the death of Kenneth Bernard Proctor.

157.    Kenneth Bernard Proctor's death was a direct and proximate result of the aforesaid negligent acts and/or omissions of HPES.

158.    Kenneth Bernard Proctor acted properly in all respects and was free from negligence in connection with this incident.

159.    As a direct and proximate result of the negligence by Defendant and/or Defendant's employees and/or agents, and through no fault of his own, decedent, Kenneth Bernard Proctor, suffered extreme conscious physical pain and bodily injury, disfigurement, and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish prior to his untimely and horrific death.

160.    As a further direct and proximate result of the negligence by Defendant and/or Defendant's employees and/or agents, decedent, Kenneth Bernard Proctor, suffered past and future lost income, lost earnings, and loss of earning capacity.

**WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of decedent, Kenneth Bernard Proctor, demands judgment against Defendant, as follows: (1) compensatory damages in the amount of not less than $20,000,000.00, which amount will be proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

**COUNT V**
**Wrongful Death: Negligence**
**(Against The Experts & HPES)**

161.    All prior paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

162.     This claim for wrongful death is brought by John Proctor, as personal representative of decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 16-2701.

163.     Alexis was an employee of The Experts and a subcontractor to HPES.

164.     Defendants had a duty, pursuant to NISPOM and other applicable law, to recognize, investigate and report to the DoD known adverse information about Alexis through the JPAS and otherwise.

165.     Such adverse information includes all information potentially raising security concerns including incidents demonstrating, among other things, emotional, mental, and personality disorders, a pattern of high risk irresponsible aggressive antisocial or emotionally unstable behavior and allegations of criminal conduct.

166.     Defendants knew but did not report adverse information about Alexis indicating he posed a foreseeable risk of harm and/or death to the safety of third parties.

167.     Specifically, Defendants became aware of facts demonstrating that Alexis was "unstable," was acting strangely, and which taken together strongly indicated that he posed a risk to the safety of third parties. However, instead of reporting this information as required by applicable law, they covered up these incidents.

168.     The risk that Alexis would commit a violent criminal act and harm others was obvious enough that it was explicitly acknowledged in this instance by many of those who came into contact with Alexis. For example, on August 6 and 7, multiple persons appeared concerned that Alexis would commit a criminal act. On August 6, The Experts' travel coordinator called the Navy Gateway Inns & Suites expressed *concern that Alexis may harm others*, and this information spurred the clerk to call the police. Additionally, after hearing reports of Alexis' behavior, CoSC's Program Manager, her immediate manager, the FSO had a call and concluded

30

that Alexis should leave Newport because they were "concerned about his behavior." In spite of this knowledge, The Experts program manager merely covered up the issue by reporting instead that Alexis was "not feeling well."

169.    On August 7, Newport police contacted the on-duty Naval Station Police Sergeant and advised her of Alexis's claims, and faxed a copy of its police report to the Naval Station Newport Security Office with the note: "FYI on this. Just thought to pass it on to you *in the event this person escalates*."

170.    As stated on page 3 of the **Findings** of the Navy Department's Report of the Investigation Into the Fatal Shooting Incident at the Washington Navy Yard on September 16, 2013, and Associated Security, Personnel, and Contracting Policies and Practices report, issued November 8, 2013: "Before September 16th, Alexis **was observed by several people, including his supervisors at The Experts, Inc, and HP Enterprise Services LLC, to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others.**

171.    Defendants became aware of adverse information about Alexis but also did not report it.

172.    In spite of Defendants' knowledge, known adverse information was not reported.

173.    Defendants were also negligent by, *inter alia*, concealing information about Alexis's erratic behavior, failing to require that Alexis clear a psychologic exam before returning to work, and scheduling Alexis to work at the Navy Yard.

174.    Defendants' negligence was a substantial factor in causing the death of Kenneth Bernard Proctor because if it had been reported properly Alexis would not have been allowed access to the location of his spree.

175.    Kenneth Bernard Proctor's death was a direct and proximate result of the aforesaid negligent acts and/or omissions of Defendants.

176.    Kenneth Bernard Proctor acted properly in all respects and was free from negligence in connection with this incident.

177.    As a direct and proximate result of Defendant's negligent acts and/or omissions, decedent's statutory beneficiaries have suffered financial loss, loss of gifts, contributions, services, care, and support of decedent, and incurred medical expenses, funeral services and expenses, and other losses and damages, which shall be proven at trial.

**WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of decedent, Kenneth Bernard Proctor, demands judgment against Defendants, as follows: (1) compensatory damages in the amount of not less than $20,000,000.00, which amount will be proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

### COUNT VI
### Survival Action: Negligence
### (Against The Experts and HPES)

178.    All prior paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

179.    This survival action is brought by John Proctor, as personal representative of decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 12-101, and is brought on behalf of the decedent's estate. Mr. Proctor was appointed decedent's personal and legal representative on March 17, 2015.

180.    Alexis was an employee of The Experts and a subcontractor to HPES.

181.    Defendants had a duty, pursuant to NISPOM and other applicable law, to recognize, investigate and report to the DoD known adverse information about Alexis through the JPAS and otherwise.

182.    Such adverse information includes all information potentially raising security concerns including incidents demonstrating, among other things, emotional, mental, and personality disorders, a pattern of high risk irresponsible aggressive antisocial or emotionally unstable behavior and allegations of criminal conduct.

183.    Defendants knew but did not report adverse information about Alexis indicating he posed a foreseeable risk of harm and/or death to the safety of third parties.

184.    Specifically, Defendants became aware of facts demonstrating that Alexis was "unstable," was acting strangely, and which taken together strongly indicated that he posed a risk to the safety of third parties. However, instead of reporting this information as required by applicable law, they covered up these incidents.

185.    The risk that Alexis would commit a violent criminal act and harm others was obvious enough that it was explicitly acknowledged in this instance by many of those who came into contact with Alexis. For example, on August 6 and 7, multiple persons appeared concerned that Alexis would commit a criminal act. On August 6, The Experts' travel coordinator called the Navy Gateway Inns & Suites expressed *concern that Alexis may harm others*, and this information spurred the clerk to call the police. Additionally, after hearing reports of Alexis' behavior, CoSC's Program Manager, her immediate manager, the FSO had a call and concluded that Alexis should leave Newport because they were "concerned about his behavior." In spite of this knowledge, The Experts program manager merely covered up the issue by reporting instead that Alexis was "not feeling well."

33

186.    On August 7, Newport police contacted the on-duty Naval Station Police Sergeant and advised her of Alexis's claims, and faxed a copy of its police report to the Naval Station Newport Security Office with the note: "FYI on this. Just thought to pass it on to you *in the event this person escalates*."

187.    As stated on page 3 of the **Findings** of the Navy Department's Report of the Investigation Into the Fatal Shooting Incident at the Washington Navy Yard on September 16, 2013, and Associated Security, Personnel, and Contracting Policies and Practices report, issued November 8, 2013: "Before September 16th, Alexis *was observed by several people, including his supervisors at The Experts, Inc, and HP Enterprise Services LLC, to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others.*"

188.    Defendants became aware of adverse information about Alexis but also did not report it.

189.    In spite of Defendants' knowledge, known adverse information was not reported.

190.    Defendants were also negligent by, *inter alia*, concealing information about Alexis's erratic behavior, failing to require that Alexis clear a psychologic exam before returning to work, and scheduling Alexis to work at the Navy Yard.

191.    Defendants' negligence was a substantial factor in causing the death of Kenneth Bernard Proctor because if it had been reported properly Alexis would not have been allowed access to the location of his spree.

192.    Kenneth Bernard Proctor's death was a direct and proximate result of the aforesaid negligent acts and/or omissions of Defendants.

193.    Kenneth Bernard Proctor acted properly in all respects and was free from negligence in connection with this incident.

194.    As a direct and proximate result of the negligence by Defendants and/or Defendants' employees and/or agents, and through no fault of his own, decedent, Kenneth Bernard Proctor, suffered extreme conscious physical pain and bodily injury, disfigurement, and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish prior to his untimely and horrific death.

195.    As a further direct and proximate result of the negligence by Defendants and/or Defendants' employees and/or agents, decedent, Kenneth Bernard Proctor, suffered past and future lost income, lost earnings, and loss of earning capacity.

**WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of decedent, Kenneth Bernard Proctor, demands judgment against Defendants, as follows: (1) compensatory damages in the amount of not less than $20,000,000.00, which amount will be proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

**COUNT VII**
**Vicarious Liability – Wrongful Death**
**(Against the Experts and HPES)**

196.    All prior paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

197.    This claim for wrongful death is brought by John Proctor, as personal representative of decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 16-2701.

198.    Alexis was an employee of The Experts and a subcontractor to HPES.

199.    The Experts and HPES had a right to control Alexis's conduct by, for example, giving him orders, controlling the performance of his work, controlling the way that Alexis performed his work.

200.    The Experts and HPES directed that Alexis work at the Washington Navy Yard and provided him with a building pass.

201.    Alexis used his apparent authority as an employee of The Experts and as a subcontractor to HPES to enter the Washington Navy Yard and carry out his attack.

202.    Alexis was acting within the apparent scope of his employment and/or agency.

203.    Alexis was aided in the commission of his violent act through an instrumentality of his agency or through conduct associated with his agency status as an employee of The Experts and as a subcontractor to HPES.

204.    But for the building pass provided and visit scheduled by The Experts and/or HPES, Alexis would not have been able to commit his act.

205.    Kenneth Bernard Proctor's death was a direct and proximate result of Alexis's acts which were carried out based on his apparent authority as an employee and/or agent or through conduct associated with his agency status.

206.    Kenneth Bernard Proctor acted properly in all respects and was free from negligence in connection with this incident.

207.    As a direct and proximate result of Alexis's conduct, decedent's statutory beneficiaries have suffered financial loss, loss of gifts, contributions, services, care, and support of decedent, and incurred medical expenses, funeral services and expenses, and other losses and damages, which shall be proven at trial.

208.  **WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of

decedent, Kenneth Bernard Proctor, demands judgment against Defendants, as follows: (1)

compensatory damages in the amount of not less than $20,000,000.00, which amount will be

proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as

permitted by law; and (4) such other and further relief as this Court deems proper.

**COUNT VIII**
**Vicarious Liability- Survival**
**(Against the Experts and HPES)**

209.  All prior paragraphs of this Complaint are hereby incorporated by reference as if

fully set forth herein.

210.  This survival action is brought by John Proctor, as personal representative of

decedent, Kenneth Bernard Proctor, pursuant to D.C. Code Ann. § 12-101, and is brought on

behalf of the decedent's estate. Mr. Proctor was appointed decedent's personal and legal

representative on March 17, 2015.

211.  Alexis was an employee of The Experts and a subcontractor to HPES.

212.  Alexis used his apparent authority as an employee of The Experts and as a

subcontractor to HPES to enter the Washington Navy Yard and carry out his attack.

213.  Alexis was acting within the apparent scope of his employment and/or agency.

214.  Alexis was aided in the commission of his violent act through an instrumentality

of his agency or through conduct associated with his agency status as an employee of The

Experts and as a subcontractor to HPES.

215.  Kenneth Bernard Proctor's death was a direct and proximate result of Alexis's

acts which were carried out based on his apparent authority as an employee and/or agent or

through conduct associated with his agency status.

216.    Alexis was therefore acting within the apparent scope of his employment and/or agency.

217.    But for the building pass provided and visit scheduled by The Experts and/or HPES, Alexis would not have been able to commit his act.

218.    Kenneth Bernard Proctor's death was a direct and proximate result of Alexis's criminal acts which were carried out based on his apparent authority as an employee and/or agent.

219.    Kenneth Bernard Proctor acted properly in all respects and was free from negligence in connection with this incident.

220.    As a direct and proximate result of Alexis's conduct, performed while under the apparent authority of The Experts and HPES which allowed him to enter the Washington Navy Yard and commit his crime, Kenneth Bernard Proctor, suffered extreme conscious physical pain and bodily injury, disfigurement, and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish prior to his untimely and horrific death.

221.    As a further direct and proximate result of these acts, decedent, Kenneth Bernard Proctor, suffered past and future lost income, lost earnings, and loss of earning capacity.

**WHEREFORE**, Plaintiff John Proctor, as personal and legal representative of decedent, Kenneth Bernard Proctor, demands judgment against Defendants, as follows: (1) compensatory damages in the amount of not less than $20,000,000.00, which amount will be proven at trial; (2) all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury with respect to each of the claims alleged herein.

Respectfully submitted,

JOHN EDWARD PROCTOR

By:     Peter C. Grenier (DC Bar No. 418570)
Stan M. Doerrer (DC Bar No. 502496)
Grenier Law Group PLLC
1400 L Street, NW Suite 420
Washington, D.C.  20005
Tel. (202) 768-9600

*Counsel for Plaintiff*

Dated: September 14, 2015