IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JOHN EDWARD PROCTOR,**<br>**as Personal Representative**<br>**of the Estate of Kenneth Bernard Proctor,**<br>**Deceased.**<br><br>         *Plaintiff,*<br><br>**v.**<br><br>**HP ENTERPRISE SERVICES, LLC, et al.**<br><br>         *Defendants* | **Case No. 1:15-cv-01494-RMC** |

**PLAINTIFF JOHN EDWARD PROCTOR'S CONSOLIDATED MEMORANDUM[1]
OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT HP ENTERPRISE SERVICES, LLC'S
AND DEFENDANT THE EXPERTS, INC.'S MOTIONS TO DISMISS**

COMES NOW, Plaintiff John Edward Proctor ("Plaintiff," "Mr. Proctor"), by and through

the undersigned counsel, and files this Memorandum in Opposition to Defendant HP Enterprise

Services, LLC's ("HPES") and Defendant The Experts, Inc.'s ("The Experts") Motions to

Dismiss. In support of this Memorandum, Plaintiff states the following:

**INTRODUCTION**

Defendants have improperly filed motions for summary judgment cloaked in Rule 12

clothing. Both Defendants improperly reference matters beyond the four corners of Plaintiff's

Complaint, and attempt to short-circuit the litigation process without any opportunity for

discovery.

---

[1] To the extent consistent with this Memorandum, Plaintiff incorporates by reference the Memoranda of the other
Plaintiffs.

Defendants also misconstrue several aspects of District of Columbia law. First, they wrongly assert that the heightened foreseeability standard applies to Plaintiff's negligent hiring, retention, and supervision claims. Even if the Court were to adopt that standard, however, District of Columbia law does not require Plaintiff to allege that Defendants knew or should have known that Aaron Alexis ("Alexis") was going to commit mass murder. Plaintiff need only demonstrate that Defendants knew or should have known that Alexis was capable of harming others. Mr. Proctor's allegations meet this burden.

Second, Defendants wrongly assert that the political question doctrine bars this Court from hearing Plaintiff's allegations, as he is <u>not</u> seeking to second-guess strategic decisions or policies of the Department of Defense. Plaintiff only asks the Court to determine whether ***private corporations*** breached duties pursuant to long-standing District of Columbia common law and Department of Defense regulations. Courts rarely apply the political question doctrine when the plaintiff is suing private entities and not the government. Also, the District of Columbia does not use a proportional liability system. Mr. Proctor can obtain all of his relief solely from the Defendant military contractors, thereby obviating the need to reevaluate any of the military's decisions.

Third, Defendants wrongly argue District of Columbia law in stating that they cannot be held liable for Alexis' intentional acts. Courts in this jurisdiction have adopted the RESTATEMENT (SECOND) OF AGENCY, which allows plaintiffs to base negligence claims upon an employee's intentional acts when the employee was aided by the agency relationship with his employer, or when an employee performed such acts through apparent authority with his employer.

Finally, Plaintiff can state a claim for negligence premised upon National Industrial Security Program Operating Manual regulations and requirements for reporting adverse

information concerning defense contractor employees. Such regulations were enacted in order to prevent security breaches and to keep Americans safe from harm.

## STATEMENT OF FACTS

This is a survival and wrongful death action arising from the tragic events that occurred on September 16, 2013, at the Washington Navy Yard in Washington, D.C. *See* Comp. at 1. Alexis, a 34-year-old ex-Navy government contractor working for The Experts pursuant to a contract with HPES, used his position as a credentialed defense contractor to enter the grounds of the Washington Navy Yard and used a shotgun to murder twelve people and injure three others in a deadly mass shooting. *Id.* at 2. Plaintiff filed suit as the personal representative for the estate of his deceased son, Kenneth Bernard Proctor, who was killed in the massacre. Comp. ¶ 4.

Prior to his employment with The Experts and HPES, Alexis was enlisted in the United States Navy. During his Navy service, Alexis was arrested on multiple occasions. Comp. ¶¶ 9-11. Alexis' arrest record should have raised red flags with his employers regarding his fitness to work at a secure government facility such as the Navy Yard. Comp. ¶ 8. Based on the below incidents, of which The Experts and HPES knew or should have known, Alexis should have never been hired:

(1)  Alexis was arrested on June 3, 2004 by the Seattle Police Department and charged with felony malicious mischief after shooting out the rear tires of a construction worker's vehicle in May. When interviewed by the police, he told them he had a "blackout" fueled by anger. Comp. ¶ 9.

(2)  On August 10, 2008, Alexis was arrested for disorderly conduct in Dekalb County, Georgia while serving in the Navy at Naval Air Station Joint Reserve Base Fort Worth. Comp. ¶ 10. He was removed from a nightclub for causing damage to furnishings and, once outside, was disorderly and continued to yell profanities. *Id.*

(3)  On September 5, 2010, Alexis was arrested in Fort Worth, Texas, for discharging a firearm in his residence the previous day. The bullet allegedly traveled through the ceiling into a neighbor's apartment. Comp. ¶ 11.

Following these instances, on December 2, 2010, Alexis requested separation from the Navy under the Enlisted Early Transition Program, a program that allowed certain enlisted members to separate within one year of the end of their obligated service. Comp. ¶ 12. The Bureau of Naval Personnel approved Alexis' request for separation on December 9, 2010. *Id.*

On September 5, 2012, Alexis applied for employment as a technician with The Experts. Comp. ¶ 14. The Experts was a subcontractor to HPES, which had a contract with the Department of Defense to provide computer services at locations including the Washington Navy Yard. *Id.* at ¶ 7. The Experts and HPES, as Alexis' employers, should have uncovered his arrests during a pre-employment background check. *Id.* at ¶ 13. Had The Experts and HPES performed a proper due diligence investigation into Alexis' background, they would have uncovered his violent past and not hired him. *Id.* In spite of his multiple arrests, Alexis was hired in September 2012. *Id.* at ¶ 15.

The Experts was a subcontractor to HPES, a prime contractor performing work under the Navy's Navy-Marine Corps Intranet ("NMCI") Continuity of Service Contract ("CoSC"). Comp. ¶ 14. The CoSC invokes the National Industrial Security Program Operating Manual ("NISPOM"), which defines the security requirements for cleared defense contractors. *Id.* ¶ 17. NISPOM required The Experts and HPES to develop and maintain a program to ensure that all pertinent derogatory information regarding cleared personnel was forwarded for consideration in the personnel security clearance determination process. *Id.* at ¶ 18. The Department of Defense Central Adjudicative Facility ("CAF") is required to be notified of derogatory information through the joint Personnel Adjudication System ("JPAS"). *Id.* at ¶ 19. Because Alexis had been cleared to access confidential information, behavioral issues that raised security concerns, such as emotional, mental and personality disorders, a pattern of high risk, irresponsible, aggressive, antisocial, or emotional behavior and allegations of criminal conduct, should have been reported to the CAF pursuant to NISPOM. *Id.* at ¶ 22.

4

From July to September 2013, The Experts assigned Alexis to work in several locations, including Virginia, Rhode Island and Maryland. Comp. ¶ 28. During this time, Alexis' conduct became increasingly erratic and raised clear red flags to all those he came in contact with at The Experts and HPES. *Id.* at ¶ 30. Such conduct included the following:

(1)     On August 4, 2013, while at the Norfolk airport awaiting a flight to Providence, Alexis called The Experts' project coordinator for the CoSC to say that another passenger was making fun of him and that Alexis was getting angry.

(2)     On August 5, 2013, Alexis contacted The Experts' travel coordinator seeking assistance in moving from the Residence Inn in Middletown, Rhode Island, to the Navy Gateway Inns & Suites on Naval Station Newport because of noisiness at the Residence Inn. Comp. ¶ 31.

(3)     On August 6, 2013, the Naval Station Newport Police responded to a call from The Navy Gateway Inns & Suites, where Alexis was staying. Upon arrival, the officers learned that Alexis had taken apart his bed, believing that someone was hiding under it, and observed that Alexis had taped a microphone to the ceiling to record the voices of people that were "following" him. Comp. ¶¶ 33-36. The hotel clerk requested that Naval Station Newport Police keep an officer close in case Alexis hurt someone. *Id.* at ¶ 33.

(4)     On August 6, 2013, Alexis reported to The Experts' travel coordinator that people were following him, talking about him through the walls, and using a machine to keep him awake. Later that evening, Alexis made a similar report to The Experts' program manager for CoSC. *Id.* at ¶ 37.

(5)     On August 6, 2013, around 8:45pm, during a call from The Experts' travel coordinator, the desk clerk at the Navy Gateway Inns & Suites read the desk log that documented: "Alexis disrupting other guests in the early morning hours of August 6, 2013, by knocking on walls and asking people to stop making noise; and that Security had talked to Alexis and noted that Alexis had "disheveled the bed." Comp. ¶ 38.

(6)     The Navy Gateway Inns & Suites desk log included the following entry at 8:45 pm on August 6, 2013: "[Travel coordinator's full name] called regarding PO3 Alexis, [Alexis] called her explaining that three people followed him from The Residence Inn when he was moved over here, he told her they keep yelling at him & following him. Comp. ¶ 39. Call her if you have any questions or concerns. ***She is very worried & is afraid he can harm others.*** *Id.* Her # is XXX-XXX-XXXX or [Program Manager's first name] who is the other manager her # is XXXXXX-XXXX." *Id.* (emphasis added).

HPES also knew or should have known that Alexis had the potential to be violent because it was informed of Alexis' troubling behavior. On August 7, 2013, at 1:12 am, The Experts' program manager sent an email to HPES representatives and The Experts' CoSC team stating

Alexis was not feeling well and would not complete the work assignment at Newport. Comp. at ¶ 44. On August 7, 2013, at about 3:00 am, Alexis called the HPES second shift deployment supervisor asking to stay in her room at the Marriott, in Newport, because he had to move out of his room. *Id.* at ¶ 45. He believed some people had followed him to the Navy Gateway Inn & Suites. *Id.* Upon arrival, Alexis told the HPES second shift deployment supervisor that three people, who traveled on the plane with him from Norfolk, and had checked into the same hotel as Alexis did, began making noise and threats against him. *Id.* at ¶ 46. At 6:20 am on the same day, the City of Newport Police responded to the hotel. *Id.* at ¶ 47. Alexis also told the HPES second shift deployment supervisor that people were trying to follow him and that he needed a radar gun to hear what they were saying. *Id.* at 55.

Despite all of the above, The Experts and HPES failed to report any derogatory information concerning Alexis to the government through JPAS. Comp. at ¶ 65. As a result of The Experts' and HPES' recklessness in failing to report Alexis' clear record of bizarre and troubling behavior, the Navy never received any derogatory information concerning Alexis. *Id.* at ¶ 65. Alexis was able to continue working for The Experts and HPES and was assigned to several other posts from August 12, 2013, to September 6, 2013. Comp. ¶ 67. On September 9, 2013, The Experts assigned Alexis to work at the Washington Navy Yard. Comp. ¶ 69.

Defendants knew, or should have known, that Alexis was likely to cause harm to others. *See, e.g.,* Comp. ¶¶ 95-98. Even the Department of Defense concluded that Defendants were on notice that Alexis was dangerous. On page 3 of the findings of the Navy Department's Report of the Investigation Into the Fatal Shooting Incident at the Washington Navy Yard, the Navy stated: ***"Before September 16th, Alexis was observed by several people, including his supervisors at The Experts, Inc., and HP Enterprise Services, LLC, to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others."*** *Id.* at ¶

98. The Experts' own employee told the Navy Gateway Inns & Suites that she was concerned that Alexis may harm others. *Id.* at ¶ 96. On September 16, 2013, Alexis went on his rampage, which would have been prevented had The Experts and HPES taken proper action pursuant to NISPOM regulations and the standard of care required under District of Columbia law. Comp. ¶ 71.

**ARGUMENT**

## I.    Standard of Review

The Experts and HPES challenge Mr. Proctor's claims as a matter of law pursuant to Fed. R. Civ. P. 12(b)(6).[2] The Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* direct federal trial courts to focus on the factual content of a complaint when deciding whether a claim is sufficiently stated to withstand a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)); *see also United States House of Representatives v. Burwell*, 2015 U.S. Dist. LEXIS 119712, *20 (D.D.C. Sept. 9, 2015). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* The factual allegations in the plaintiff's complaint need not be "detailed" to overcome a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.*

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the complaint. *Search v. Uber Techs., Inc.*, 2015 U.S. Dist. LEXIS 120456, *6-7 (D.D.C. Sept. 10, 2015). Where the Court must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment under Rule 56." *Id.* (citing Fed. R. Civ. P.

---

[2] As noted above, Plaintiff maintains that Defendants have in fact filed a motion for summary judgment, inasmuch as they have introduced extrinsic evidence.

12(d)). Such conversion is premature, however, if all parties have not yet had the "opportunity to present evidence in support of their respective positions."

The Experts also moves for dismissal of Mr. Proctor's claims under the political question doctrine. Such challenges invoke Fed. R. Civ. P. 12(b)(1). *See, e.g., Schneider v. Kissinger*, 12 F.3d 190 (D.C. Cir. 2005). "The distinctions between 12(b)(1) and 12(b)(6) are important and well understood. Rule 12(b)(1) presents a threshold challenge to the court's jurisdiction, whereas 12(b)(6) presents a ruling on the merits with res judicata effect." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (quoting *Haase v. Sessions*, 266 U.S. App. D.C. 325, 835 F.2d 902, 906 (D.C. Cir. 1987)). "In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." *Id.* (quoting *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993)). "[F]actual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60, 67 (D.D.C. 2007).

## II.     Defendants' Motions Are Premature and Incorporate Materials Outside of Mr. Proctor's Pleadings

Both Defendants' Motions to Dismiss reference materials outside of Mr. Proctor's Complaint. HPES attached an attorney declaration from Jason C. Raofield, Esq., which references three exhibits: (1) the November 8, 2013, investigative report issued by the Navy; (2) NISPOM; and (3) The Department of Industrial Security Letter dated September 23, 2011. *See* ECF 15-1. The Experts attached a copy of the agreement between the HPES and The Experts. *See* ECF 16-2. While Plaintiff Patricia Delorenzo attached several materials to her Complaint, Mr. Proctor has not. Thus, any reference to materials beyond Mr. Proctor's pleadings is improper. *Search Techs*, 2015 U.S. Dist. LEXIS 120456, *6-7.

Where the Court considers "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Under the Federal Rules of Civil Procedure, "when a Rule 12(b)(6) motion to dismiss is converted into a motion for summary judgment, all parties must be given a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.' Furthermore, it is settled that the term 'reasonable opportunity' includes the opportunity 'to pursue reasonable discovery.'" *Thorne v. D.C.*, 2006 U.S. Dist. LEXIS 91438, *18-19 (D.D.C. Dec. 19, 2006) (quoting *First Chicago Int'l v. United Exch. Co.*, 267 U.S. App. D.C. 27, 836 F.2d 1375, 1380 (D.C. Cir. 1988)). That is because summary judgment ordinarily "is proper only after the plaintiff has been given adequate time for discovery." *Id.*

In attaching extraneous materials to their motions, Defendants attempt to have the Court adjudicate Mr. Proctor's claim prematurely without providing any discovery. If this Court considers any of the materials attached to Defendants' Motions, Mr. Proctor should be provided an opportunity to pursue reasonable discovery. *Thorne*, 2006 U.S. Dist. LEXIS 91438, *18-19. Out of fairness, Plaintiffs should be permitted to conduct discovery on the topics listed in the attached Declaration. *See* Decl. of Peter C. Grenier.

## III. Mr. Proctor Alleges Sufficient Facts to Support His Claims for Negligent Hiring, Supervision, and Retention, Which Are Not Subject to a Heightened Foreseeability Standard

### A. The District of Columbia's Heightened Foreseeability Standard Does Not Apply to Claims for Negligent Hiring, Retention, and Supervision

Defendants wrongly assert that a heightened foreseeability standard applies to Mr. Proctor's allegations. The Experts' Mem. at 33-34; HEPS Mot. at 22-23. Defendants further argue that, under this standard, Mr. Proctor's claims fail as a matter of law because he cannot demonstrate that it was "highly" or "particularly" foreseeable that Alexis would commit mass

murder given what they knew about Alexis. *Id.* Defendants wrongly extend the heightened foreseeability standard to this case, which involves claims for negligent hiring, retention, and supervision. District of Columbia courts have never applied the heightened foreseeability standard to such claims.

To establish negligence under District of Columbia law, a plaintiff need only allege "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512, 514 (D.C. Cir. 2010) (quoting *District of Columbia v. Beretta*, 872 A.2d 633, 642, n.3 (D.C. 2005)). Where a plaintiff attempts to hold a Defendant liable for injuries caused by the intervening criminal act of a third party, District of Columbia courts may, in limited instances, apply a "heightened foreseeability standard[,]" which seeks to determine whether "the criminal act was so foreseeable that a duty arises to guard against it." *Board of Trustees v DiSalvo*, 974 A.2d 868, 871 (D.C. 2009). An intervening negligent or criminal act will only cut off causation if it was not a reasonably foreseeable consequence of the defendant's failure to meet its duty of care. *See* Exhibit A – *Doe v. De Amigos*, Case No. 1:11-cv-01755-ABJ, at 3 (D.D.C. Jan. 23, 2014) (unpublished). Furthermore, "[f]oreseeability is a question of fact for the jury . . ." *Id.*

However, cases involving a "special relationship" are "fundamentally different." *Romero v. National Rifle Asso.*, 749 F.2d 77, 81 (D.C. Cir. 1984). A "special relationship" could include a landlord-tenant relationship or, as in this case, an employer-employee relationship, which constitutes "a relationship of control between the defendant and the intervening criminal actor." *Id.* (citing *Hicks v. United States*, 167 U.S. App. D.C. 169, 511 F.2d 407 (D.C. Cir. 1975) (finding negligence where a hospital improperly released a potentially violent patient)). As Alexis' employers, Defendants had a special relationship with the intervening criminal actor, making this case "fundamentally different" from the cases upon which Defendants rely.

10

A case involving an employer-employee relationship is viewed differently. First, employers have control over their employees' interactions with the public. As such, employers have a greater responsibility to ensure their employees do not harm others. Second, employers are in a unique position to know the potential dangers their employees may create. Employers, especially government contractors for the Department of Defense, should be more knowledgeable about their own employees' actions than those of strangers.

The District of Columbia Court of Appeals confirmed these principals in *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61 (D.C. 1983). In that case, Dermot Murphy was shot six times by the gardener of the Army Distaff Foundation, which owned a military retirement home. In support of his negligent supervision claim, Murphy presented evidence that the gardener had confrontations with other youths in the past. While remarking that this fact alone did not put the employer on notice that the gardener would carry a gun or had a propensity to use one, the Court of Appeals still reversed the trial court because "one who engages in an enterprise is under a duty to anticipate and to guard against the human traits of his employees which unless regulated are likely to cause harm to others." *Id.* at 64 (citing § 214 of the RESTATEMENT OF AGENCY (1957)).

Even acknowledging that Murphy could not adduce evidence of the employer's notice of prior identical acts, the Court of Appeals still reversed summary judgment because the employer was aware of confrontations in the past that put the employer on notice of the general potential for harm. This decision confirms that there is no heightened standard of foreseeability in a claim for negligent hiring, retention or supervision. The plaintiff need only show that the employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

The cases Defendants cite in support of the application of the heightened foreseeability standard mostly pertain to premises liability and do not involve negligent hiring, retention, and supervision claims. For example, *DiSalvo* involved an assault by two unidentified assailants in a university campus' parking garage. *DiSalvo*, 974 A.2d 868. The case had nothing to do with injuries caused by the defendant's employee. Similarly, in *Workman v. United Methodist Comm.*, 320 F.3d 259 (D.C. Cir. 2003), the plaintiff sued a relief agency after her daughter was murdered in Somalia. That case also did not involve an employee's harmful conduct. Also, both *Workman* and *DiSalvo* were decided after discovery was completed. *DiSalvo*, 974 A.2d at 870 (the defendant appealed the trial court's denial of its motion for judgment as a matter of law); *Workman*, 320 F.3d at 260 (the plaintiff appealed the district court's entry of summary judgment). Mr. Proctor has had no opportunity to conduct discovery.

HPES attempts to shoehorn the facts of this case into the framework of *G'Sell v. Carven*, 724 F. Supp. 2d 101 (D.D.C. 2010). HPES' Mot. at 16-20. In *G'sell*, the plaintiffs were assaulted in a common area of an apartment building. They sued the building's owner and its management company for negligence. The complaint alleged that the building's security officer had failed to take action following an incident earlier the same day in which the criminal assailants were lying naked on the floor near the elevator, engaging in simulated sexual acts. *Id.* at 106, 108. Applying the "heightened foreseeability" requirement, the court dismissed the claim under Rule 12(b)(6) on the basis that there was no duty to protect the plaintiffs from the criminal sexual assault that occurred later that same day. *Id.* The court noted that during the earlier incident the assailants had "engaged in obnoxious behavior, but they were not being violent or harassing third parties." *Id.* at 108. The court reasons that the assailants' "non-violent behavior did not make it foreseeable that they would violently attack plaintiffs." *Id.*

*G'Sell* is completely inapplicable here. First, the assailants in *G'Sell* were not employees of the defendants. The defendants had absolutely no control over the assailants, nor were the defendants in a unique position to know of their potentially dangerous behavior. Therefore, the plaintiffs could not bring a negligent hiring, retention, or supervision claim, as is the case here. As stated above, cases involving a "special relationship" are "fundamentally different." *Romero*, 749 F.2d at 81. Second, in *G'Sell*, the only notice the plaintiff proffered of the assailants' potential to harm was one instance of simulated sex acts. *G'Sell*, 724 F. Supp. 2d at 106. It would have taken a leap in logic for defendants to predict, based solely upon this juvenile behavior, that the assailants were violent or dangerous.

In this case, not only was it foreseeable that Alexis was capable of harming others, but *The Experts' own employee informed others that she was afraid Alexis would harm others*. Comp. ¶¶ 34-33, 39, 96. In the findings of the Navy Department's Report issued November 3, 2013, the Navy stated that, "[b]efore September 16th, Alexis *was observed by several people, including his supervisors at The Experts, Inc., and HP Enterprise Services LLC, to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others.*" Comp. ¶ 98.

Defendants fail to cite *any* case applying heightened foreseeability to a claim for negligent hiring, retention, and supervision. Numerous District of Columbia cases involving negligent hiring, retention, and supervision confirm that such cases are not subject to the heightened foreseeability standard. That is because a defendant employer has greater responsibility and control over the actions of its own employees than those of third parties, even if criminal in nature.

Defendants may attempt to cite *Boykin v. District of Columbia*, 484 A.2d 560, 564 (D.C. 1984) as a negligent hiring action that invoked the heightened foreseeability standard. In *Boykin*, a teacher sexually assaulted a blind student. The court analyzed the plaintiff's claim under the

heightened foreseeability standard, because that case was not employee-specific as is the case now

before the Court. The *Boykin* court's treatment of negligent hiring was specific to the allegations

in that case, as the court noted that the plaintiff's negligence claim was "limited to an assertion

that it was negligent for the District to allow *any* teacher to have one-one-one contacts with a

student such as [the plaintiff]" because "instances of child abuse are sufficiently common that

intentional torts of this sort are foreseeable." *Id.* at 546-565. In other words, the claim in *Boykin*

was, functionally, a general negligence claim and not a claim for negligent hiring, retention and

supervision. As stated above, claims involving the defendant's negligence in hiring, retaining, or

supervising an employee are inherently different from claims involving the intentional acts of third

parties.

This case is more akin to *Fleming v. Bronfin*, 80 A.2d 915 (D.C. 1951), the seminal

District of Columbia case on negligent hiring, retention, and supervision claims. In *Fleming*, a

deliveryman assaulted the plaintiff after he delivered groceries to her home. The victim appealed

the trial court's directed verdict for the employer because it reasoned that an employer cannot be

held liable for the intentional acts of its employee taken outside of the scope of his employment.

*Id.* The District of Columbia Court of Appeals invoked the RESTATEMENT OF TORTS, holding that

"one dealing with the public is bound to use reasonable care to select employees competent and fit

for the work assigned to them and to refrain from retaining the services of an unfit employee." *Id.*

at 917. The Court of Appeals further held that, "when an employer neglects this duty and as a

result injury is occasioned to a third person, the employer may be liable even though the injury

was brought about by the willful act of the employee beyond the scope of his employment." *Id.* In

*Fleming*, the court never held that any heightened foreseeability requirement existed in such

negligent hiring and retention claims.

Every case since *Fleming* confirms that the District of Columbia recognizes negligent hiring, retention and supervision claims as a form of regular negligence that does not require the plaintiff to meet a heightened foreseeability standard. In *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33 (D.D.C. 2003), for example, the plaintiffs' negligent supervision claim alleged that the defendant cab company discriminated against potential customers living in Anacostia, a primarily African American neighborhood. In examining the employer's motion for summary judgment, this Court held that a claim for negligent supervision requires the plaintiff to show that, "an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Id.* at 51 (quoting *Giles v. Shell Oil Corp.,* 487 A.2d 610, 613 (D.C. 1985)); *see also Adams v. Vertex, Inc.*, 2007 U.S. Dist. LEXIS 22850, *9 (D.D.C. Mar. 29, 2007); *Beyene v. Hilton Hotels Corp.*, 958 F. Supp. 2d 247, 252 (D.D.C. 2013); *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002).

This Court denied the cab company's motion for summary judgment, holding that there was a genuine issue of material fact as to the company's knowledge that its drivers purposefully avoided certain areas of the District. *Id.* at 52-53. The plaintiffs presented only circumstantial evidence to demonstrate the defendant's knowledge, including evidence that the cab company did not properly announce requests for service to Anacostia and did not provide maps of Anacostia to its drivers. *Id.* at 51. Importantly, in *Mitchell*, the Court never stated that the plaintiff had to present evidence of prior similar acts or that the defendant should have foreseen the precise harm that occurred. The plaintiff's evidence of the employer's negligence was merely circumstantial. Such evidence was sufficient to overcome the defendant's motion for summary judgment.

No District of Columbia court has imposed the heightened foreseeability standard to a claim for negligent hiring, retention, and supervision. Pursuant to *Giles*, Mr. Proctor need only

15

show that the employer knew that its employee behaved in a dangerous, or merely an incompetent manner, to be liable for the employee's actions that harm others. *Giles*, 487 A.2d at 613. Mr. Proctor need not prove that Defendants foresaw, with perfect clarity, that Alexis would commit mass murder in the Navy Yard.

### B.   Mr. Proctor's Allegations Meet the Pleading Requirement for a Negligent Hiring, Retention, and Supervision Claim

As stated above, for a claim of negligent hiring, retention, and supervision to survive a motion to dismiss, Mr. Proctor need only show that the employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles,* 487 A.2d at 613. Here, Mr. Proctor's factual allegations, which must be accepted as true, are more than sufficient to meet the pleading standard of a negligent hiring, retention, and supervision claim. Mr. Proctor described in great detail Aaron Alexis' series of troubling actions that put The Experts on notice that Alexis was a danger to others.

First, Mr. Proctor describes Alexis' arrests of June 3, 2004, August 10, 2008 and September 5, 2010. Comp., ¶¶ 9-11. In the 2004 incident, Alexis shot out the rear tires of a construction worker's vehicle. *Id.* at ¶ 9. In the 2010 incident, Alexis shot through the ceiling of his apartment. *Id.* at ¶ 11. Mr. Proctor further alleges that Defendants *should* have known of these arrests through a pre-employment background check. *Id.* at ¶¶ 8, 13, 94, 111, 129, 147. As a government contractor working for Department of Defense projects, one would expect Alexis' employers to check his arrest record to ensure that he did not have a history of violence.

Defendants go to great lengths to dispel these allegations, arguing that there was no way they could have known of Alexis' history for violence through his arrest record. *See, e.g.,* The Experts' Mem. at 5, 7-8; HPES' Mot. at 22-23. In fact, much of The Experts' brief is dedicated to

16

blaming the Navy for its failure to disclose Alexis' arrest record. The Experts' Mem. at 7-8.

However, in the District of Columbia, allegations concerning what an employer knew, or should

have known, are matters of fact and cannot be adjudicated at the motion to dismiss phase. *See,*

*e.g., Murphy*, 458 A.2d at 64 (reversing the grant of summary judgment because of the

"conflicting state of evidence" concerning what the employer knew or should have known).

Mr. Proctor further alleges that The Experts had highly detailed and specific knowledge of

Alexis' declining mental status and that he was capable of harming others in the month leading up

to the tragic incident. On August 4, 2013, Alexis called The Experts' project coordinator to inform

him that a fellow airline passenger was making fun of him and that he was getting angry at the

passenger. Comp. ¶ 30. The project coordinator found the event serious enough to instruct Alexis

to contact airport security. *Id.* From August 6 to August 7, 2013, the Naval Station Newport Police

Department received four calls from and about Alexis, one of which led the front desk clerk at the

Navy Gateway Inns & Suites to request that Naval Station Newport Police keep an officer close to

the hotel to keep him from hurting someone. *Id.* at ¶ 32-33. ***This request was based on a phone***

***call from The Experts' travel coordinator to the hotel expressing concern that Alexis may harm***

***others.*** *Id.* at ¶ 34. Alexis' behavior was also so troubling that The Experts' management team had

concluded that Alexis should leave Newport until he convinced them otherwise. *Id.* at ¶¶ 42-43. In

addition, the Navy's Report of November 8, 2013 stated that "Before September 16th, Alexis ***was***

***observed by several people, including his supervisors at The Experts, Inc., and HP Enterprise***

***Services LLC, to behave in a way that raised concerns about his mental stability and presented***

***indicators that he may cause harm to others.***" Comp. ¶ 98.

Based on the above facts, Defendants knew or should have known that Alexis behaved in a

dangerous or otherwise incompetent manner, but armed with that knowledge, failed to supervise

and/or terminate his employment. *Giles*, 487 A.2d at 613.

C.    **Defendants' Construction of the Heightened Foreseeability Standard is Inaccurate, but Even if the Court Accepts it, Mr. Proctor's Allegations are Sufficient to Overcome the Motions to Dismiss**

(1)    **Defendants' Construction of the Heightened Foreseeability Standard is Inaccurate**

Even if the Court determines that the heightened foreseeability standard applies to Mr. Proctor's negligence claims, Defendants seek to apply a corrupted version of it. HPES claims that the heightened foreseeability standard "is not satisfied by mere wrongdoing," but requires Mr. Proctor to show "that the particular type of crime committed by Mr. Alexis was foreseeable." HPES' Mot. at 14. The Experts' construction of the standard would require Mr. Proctor to demonstrate that "mass murder was, as a matter of law, highly foreseeable to The Experts given the limited number of facts about Alexis that The Experts *actually knew then*, when it hired Alexis or when The Experts representatives interacted with him in August 2013." The Experts' Mem. at 30-31. To support their untenable position, Defendants highlight the fact that Alexis' actions in August 2013 leading up to the shooting "did not involve a firearm or other deadly weapon" and "certainly did not involve or forecast Alexis committing mass murder, harming his co-worker's, or even threatening anyone." *Id.* at 36.

The notion that a plaintiff must "show the previous occurrence of a particular type of crime" to meet the heightened foreseeability standard is "at odds with D.C.'s multi-factored, anti-talismanic approach to foreseeability." *Doe v. Dominion Bank, N.A.*, 295 U.S. App. D.C. 385, 963 F.2d 1552, 1561 (1992). In fact, "D.C. decisions are hardly crystalline in their treatment of foreseeability." *Id.* at 1560. In addition, the heightened foreseeability analysis is not comprised solely of asking whether the particular harm that occurred was foreseeable. A seminal case on heightened foreseeability, *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980), held that "foreseeability of particular conduct is *a relevant factor* in determining the nature of the risk and

18

the standard of conduct" (emphasis added). The court did not determine that foreseeability of particular conduct is *the only factor* in the analysis.

Whether the plaintiff's allegations suffice under the heightened foreseeability standard is a highly fact-specific inquiry that must take into account the details of each individual situation. The analysis does *not* require Mr. Proctor to allege that Defendants could have foreseen with perfect accuracy the exact details of the 2013 Navy Yard shooting. Not surprisingly, in each of the cases Defendants offer in support of dismissal, the court found that the standard was not met. However, there are several instances in which courts have found intervening criminal acts to be foreseeable. Such cases are similar to the case at bar.

First, in *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 F.2d 477 (D.C. Cir. 1970), the court found that the defendant landlord had a duty to protect its tenants against foreseeable dangers, in part, because of the landlord-tenant relationship. The court also stated, "there is no liability normally imposed upon the one having the power to act if the violence is sudden and unexpected *provided that the source of the violence is not an employee of the one in control.*" (emphasis added) *Id.* at 483. That is because such situations are "fundamentally different." *Romero*, 749 F.2d at 81. The court in *Kline* determined that the defendant owed a duty under the heightened foreseeability standard because the building had experienced an increased crime wave and, as the landlord, the tenant was in a unique position to protect its tenants. *Id.* at 483. As the employer of Alexis, Defendants were similarly in a unique position to prevent him from harming others. They controlled his entry to and egress from jobsites, including the Navy Yard location. They also had the ability to suspend him from work or terminate his employment for safety reasons, but completely failed to do so.

Second, in *District of Columbia v. Doe*, 524 A.2d 30, 33 (1987), a young female student was abducted from inside an elementary school classroom and raped by an unknown intruder. The

19

Court of Appeals upheld the trial court's ruling that there were sufficient factors to satisfy the heightened foreseeability standard. The District attempted to argue that there was no evidence of prior abductions and sexual assaults on the school grounds and, therefore, it owed no duty to the plaintiff. However, the court found that "normally a defendant need not foresee the precise injury, nor have notice of the particular method in which the harm is brought about in order for the plaintiff to establish proximate causation . . ." *Id.* Additionally, the court held that the heightened foreseeability standard can be met "by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act." *Id.* The factors that led the court to conclude that the school owed a duty included other crimes that had occurred in and around the school and the school's deficient security. *Id.* The court also relied on the very general fact that adult males "freely roamed throughout the school" as evidence for foreseeability of the sexual assault. *Id.* at 34.

The court determined the harm was foreseeable in *District of Columbia v. Doe,* but there is much more evidence of foreseeability in this case. Here, Defendants were aware that Alexis' bizarre and troubling behavior was escalating over multiple days to the point where The Experts' program manager informed others that it was possible he could harm someone. *See, e.g.,* Comp. ¶¶ 33-34, 39, 94, 96-99. In *District of Columbia v. Doe*, there was no evidence whatsoever of *any* notice to the school of the assailant's aggressive or violent behavior. Instead, that court relied on the vague and generic threat of "adult males" roaming through the school and the fact that the area surrounding the school at issue had a high crime rate. Like the school in *District of Columbia v. Doe*, this case also involves a history of crime in and around the Navy Yard. There were two prior attacks on the Navy Yard - the first in 1983 when a Puerto Rican separatist group set off a bomb in a computer center; the second in 1984 when a bomb was set off in the Washington Navy Yard Officer's Club. Comp. ¶ 80.

20

Lastly, in *Doe v. Dominion Bank, N.A.*, 963 F.2d 1552 (1992), the plaintiff was raped at

Dominion Bank, which held the master lease on the premises where the rape occurred. The crime

occurred during the workday in an unlocked office on a vacant floor. Dominion Bank attempted to

argue that the attack was not foreseeable because the plaintiff failed to show that other sexual

attacks had occurred in this building. The court stated that a plaintiff need *not* prove that other

crimes of the exact same type had occurred previously in the same building. *Doe*, 963 F.2d 1552,

1561. And, even if that were the standard, Mr. Proctor has alleged that the Navy Yard *had* suffered

mass attacks in the past. Comp. ¶ 80.

> **(2)    Even if the Court Accepts Defendants' Inaccurate Version of the
> Heightened Foreseeability Standard, Mr. Proctor Alleges Sufficient
> Facts to Overcome Defendants' Motion to Dismiss**

The Experts' construction of the heightened foreseeability standard would require Mr.

Proctor to demonstrate specifically that mass murder was highly foreseeable.[3] The Experts' Mem.

at 30-31. HPES agrees and asserts that Mr. Proctor must allege that it had reason to anticipate

Alexis would commit murder or mass murder. HPES' Mot. at 17-16. However, even if

Defendants' corrupted version of the heightened foreseeability standard is accepted, Mr. Proctor

has alleged sufficient facts to overcome Defendants' Motions to Dismiss.

Mr. Proctor's Complaint paints Alexis as an unstable, violent person whose condition was

so volatile in the month prior to the shooting that it foreshadowed the events that transpired on

September 16, 2013. To reiterate the allegations, Mr. Proctor alleges that Alexis' behavior was so

disconcerting that The Experts' own employee informed a hotel clerk that she was very worried

and afraid Alexis could harm someone. Comp. ¶¶ 34, 39. The Navy concluded that Alexis'

behavior "raised concerns about his mental stability and presented indicators that he could harm

---

[3] Taken to its logical extreme, Defendants would distinguish between the victims who died and those who survived – this hair-splitting is self-evidently absurd.

others." Comp. ¶ 98. Mr. Proctor further alleges that Alexis was arrested multiple times before he was hired by The Experts. Comp. ¶¶ 8-13. On two occasions such arrests involved violence perpetrated with a firearm. Comp. ¶¶ 9, 11. Alexis' prior arrests involving firearms, coupled with his bizarre behavior in August 2013, certainly could lead a jury to conclude that Defendants knew, or should have known, of the danger of murder or mass murder. Mr. Proctor alleges that Defendants did know, or have reason to know, of the danger of mass murder based upon these facts. Comp. ¶¶ 94, 111, 129, 147, 166, 183.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) will only be granted where the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Phillips v. Fed. Bureau of Prisons*, 271 F. Supp. 2d 97, 99 (D.D.C. 2003). Mr. Proctor's factual allegations must be accepted as true and all reasonable inferences must be drawn in his favor. *Id.* District of Columbia law is clear that issues such as notice, knowledge, constructive knowledge, and foreseeability are issues of fact reserved for the jury. *See, e.g., Murphy*, 458 A.2d at 64 (reversing the grant of summary judgment because of the "conflicting state of evidence" concerning what the employer knew or should have known of their employees' ability to cause harm).

The Experts offers *Phillips v. Federal Bureau of Prisons*, 271 F. Supp. 2d 97 (D.D.C. 2003) as an example of a case in which the heightened foreseeability standard was properly applied. The Experts' Mem. at 36, fn. 24. In *Phillips,* Samuel Phillips, a federal inmate, was placed in a halfway house in Washington, D.C. Mr. Phillips' mother filed a complaint alleging that her son warned the owner of the halfway house that he had received threats on his life, that the warning was ignored, and that Mr. Phillips was shot and killed as a result. *Phillips*, 271 F. Supp. 2d at 98. Like in this case, the defendants in *Phillips* argued that the heightened foreseeability requirement applied. This Court held,

> The problem with this argument is that it overlooks the facts alleged by Ms.
> Phillips, which the Court accepts as true and draws all reasonable inferences
> therefrom for purposes of a motion to dismiss. That is, Ms. Phillips specifically
> avers that Hope Village staff *did know* of the threat against her son and did nothing
> about it.

*Id.* at 103. As in *Phillips*, this Court must accept Mr. Proctor's allegations as true. Mr.

Proctor alleges in several instances that Defendants knew or should have known that

Alexis "posed a foreseeable risk of harm and/or death to the safety of third parties." Comp.

¶¶ 94, 111, 129, 147, 166, 183. Such allegations *must* be accepted as true. These are not

merely conclusory allegations as Defendants assert. *See* HPES' Mot. at 4, 6, 11, 15; The

Experts' Mem. at 28-29, 35. Mr. Proctor provides sufficient detail concerning his

allegations to survive Defendants' Motions to Dismiss by describing each action about

which Defendants knew or should have known.

HPES endorses *Hicks v. United States*, 511 F.2d 407 (D.C. Cir. 1975) as an

example of "a case in which the murder *was* foreseeable, because it involved abundant

specificity and particularly . . ." HPES' Mot. at 19. In *Hicks*, the court stated the

intervening criminal act of a third party is an issue of proximate cause and that such an

issue is "ordinarily a question for the jury. It is not a question of science or legal

knowledge. It is to be determined as a fact, in view of the circumstances of fact attending

it." *Hicks*, 511 F.2d at 420 (quoting *Supreme Court in Milwaukee and St. Paul Railway Co.

v. Kellogg*, 94 U.S. 469, 474-75, 24 L. Ed. 256 (1896)). *Hicks*, like *Phillips*, confirms that

the primary disputes in this case are matters of fact to be determined by a jury. Mr.

Proctor's allegations cannot be dismissed at this early stage of litigation. Frankly, is it truly

surprising that, given the repeated and disturbing historical behavior of Alexis, he

committed the acts at the Navy Yard that day? This fits precisely the well-worn stories of

other mass shootings – the Aurora, Colorado movie theater shootings, for example. One

need only ask – why did The Experts' travel coordinator, upon observing Alexis, fear precisely that which ultimately did occur (harming others)?

### D.    At a Minimum, Mr. Proctor Should be Permitted to Conduct Discovery on the Issue of Foreseeability

Defendants are attempting to dismiss Mr. Proctor's claims before he has had any opportunity to conduct any discovery. All of the facts Mr. Proctor and other Plaintiffs have been able to gather thus far have come from publicly available sources. From only publicly available materials, Mr. Proctor discovered that The Experts' own employee was worried Alexis would harm someone. Comp. ¶¶ 33-34. It is entirely possible – indeed, highly probable – that, through deposing other employees of Defendants and other means of discovery, Mr. Proctor will obtain additional evidence confirming Defendants' notice of Mr. Proctor's propensity for violence and the likelihood that he would harm others. *See* Decl. of Peter Grenier. District of Columbia law supports letting the jury decide whether the Navy Yard attack was foreseeable to Defendants.

In *Doe v. De Amigos, LLC*, the plaintiff sued De Amigos, LLC and Mazin Saleh for bodily and emotional injuries sustained from a sexual assault that occurred after she had consumed alcohol at Spot Lounge D.C., which De Amigos operated. Exhibit A. This Court held that the issue was a matter of first impression and, therefore, it was "necessary for the entire set of facts to be presented to a properly instructed jury to determine the question of foreseeability in the first instance . . ." *Id.* The same conclusion is warranted here. There is no District of Columbia case precisely on point concerning the foreseeability of a mass shooting. Therefore, even if this Court adopts the heightened foreseeability standard in this case, the full set of facts should be presented to a jury to determine foreseeability. *Id.* ("foreseeability is a question of fact for the jury . . .").

Furthermore, if the Court is inclined to adopt Defendants' construction of the heightened foreseeability standard and dismiss Mr. Proctor's negligence claims, Mr. Proctor respectfully

requests that the Court grant leave to amend the Complaint. *Caribbean Broad. Sys., v. Cable & Wireless PLC*, 331 U.S. App. D.C. 226, 148 F.3d 1080, 1084 (D.C. Cir. 1998) (quoting *Rosen v. TRW, Inc.*, 979 F.2d 191, 194 (11th Cir. 1992) ("leave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim")).

## IV.    The Political Question Doctrine is Inapplicable

Mr. Proctor's negligence claims can be broken down into two parts: (1) negligence in hiring, retaining and supervising Alexis; and (2) negligence in failing to report adverse information about Alexis. The Experts assert that both categories of negligence claims must be dismissed because they implicate non-justiciable political questions. The Experts' Mem. at 14-28. According to The Experts, negligence claims, "inextricably involve political questions surrounding national security and military judgment and implicate three of the *Baker* factors." *Id.* at 14.[4] This position could not be more wrong and indeed this very Court (Judge Collyer) recently wrote on the subject. *See Burwell*, 2015 U.S. Dist. LEXIS 119712, *22-24, *60-65.

### A.    The Political Question Factors

In *Baker v. Carr*, the United States Supreme Court issued guidelines to determine whether certain cases should be excluded from judicial review because they involve policy choices and value determinations constitutionally committed for resolution by the legislative or executive branches. *Baker v. Carr*, 369 U.S. 186, 222, 82 S. Ct. 691, 712 (1962). However, "[i]t is emphatically the province and duty of the judicial department to say what the law is and the political question doctrine's shifting contours and uncertain underpinnings make it susceptible to indiscriminate and overbroad application to claims properly before the federal courts." *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 69 (quoting and citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514 (D.C. Cir.

---

[4] HPES does not address the political question doctrine in its Motion to Dismiss.

1984)). "The political question doctrine has occupied a more limited place in the Supreme Court's jurisprudence than is sometimes assumed. The Court has relied on the doctrine only twice in the last 50 years." *Id.* (quoting *El–Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (en banc.) (Kavanaugh, J., concurring in judgment)).

The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 211, 82 S. Ct. 691, 706 (1962). The Supreme Court has enumerated factors that may render a case non-justiciable:

(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2) a lack of judicially discoverable and manageable standards for resolving the issue;

(3) the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion;

(4) the impossibility of a court's undertaking independent resolution of the issue without expressing lack of respect due coordinate branches of government;

(5) an unusual need for unquestioning adherence to a political decision already made; or

(6) the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *Hwang Geum Joo v. Japan*, 413 F.3d 45, 48 (D.C. Cir. 2005); *see also Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (citing the six Baker tests and noting that "these tests are probably listed in descending order of both importance and certainty."). Unless one of these formulations is "***inextricable*** from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." *Baker*, 369 U.S. at 217 (emphasis added).

Common law tort claims rarely present nonjusticiable political questions. *See Comer v. Murphy Oil USA*, 585 F. 3d 855, 973 (5th Cir. 2009). Thus, federal cases in which subject matter jurisdiction and standing are properly asserted are rarely dismissed pursuant to the political

question doctrine. *See Zivotofsky v Secretary of State*, 571 F. 3d 1227, 1236 (D.C. Cir. 2009); *Doe v Exxon Mobil Corp.*, 473 F. 3d 345, 354 (D.C. Cir. 2007); *Sarei v. Rio Tinto*, PLC, 456 F.3d 1069 (9th Cir.2006); *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 279-82 (1st Cir. 2005) (holding that a tort suit by victims of terrorism against the PLO does not present a non-justiciable political question). Each case requires "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 9 (D.D.C 2005) (citing *Baker*, 369 U.S. at 211-12).

## B.   Mr. Proctor's Negligence Claims Do Not Invoke the Political Question Doctrine

### (1)   No Issue in this Case Has Been Committed to a Political Department

The Experts claims that Plaintiff's allegations involve military judgments and that the political question doctrine applies "any time a case involves analysis of a sensitive military decision, regardless of whether it is a battlefield command or a more mundane administrative function." The Experts' Mem. at 23. This is incorrect on multiple levels. First, the political question doctrine does not apply to "mundane administrative functions," especially those that have no relation to military or other political decisions. Second, Defendants' actions and omissions with respect to Alexis have nothing to do with military judgments; therefore, the first *Baker* factor is inapplicable to Mr. Proctor's negligent hiring, retention and supervision claims.

"The first Baker formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government." *Lane v. Halliburton*, 529 F.3d 548, 560 (5th Cir. 2008). Contrary to The Experts' assertions, the political question doctrine "does not exclude the courts from every dispute that can arguably be connected to the military or combat." *Ibrahim*,

391 F. Supp. 2d at 9 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 159 L. Ed. 2d 578, 124 S. Ct. 2633, 2645-51 (2004)). "The fact that an action is taken in the ordinary exercise of discretion in the conduct of war does not put it beyond the judicial power." *Id.* (quoting and citing *Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992)); *see also McMahon*, 502 F.3d at 1360-61.

In *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 13 (D.D.C. 2005) (claim dismissed on other grounds by *Saleh v. Titan Corp.*, 2009 U.S. App. LEXIS 20337 (D.C. Cir., Sept. 11, 2009)), for example, seven Iraqi nationals sued private government contractors, alleging that they or their late husbands were tortured by employees of defense contractors while detained by the U.S. military at the Abu Ghraib prison. In denying the defense contractors' motion to dismiss with respect to the plaintiffs' common law claims, including negligence, this Court rejected the political question defense. *Id.* This Court stated that an action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve the courts in "overseeing the conduct of foreign policy or the use and disposition of military power." *Id.* at 15.

In *Lane*, civilian truck drivers, or their spouses, sued various government contractors for injuries sustained while working in Iraq. *Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008). The plaintiffs alleged that the defense contractor, KBR, misrepresented the conditions in Iraq by stating that it was safe. *Id.* at 554. The plaintiffs further alleged that KBR failed to halt truck convoys even though the conditions were not safe to continue. *Id.* at 554. The Fifth Circuit held that because the suit was against a private corporation, KBR faced a "double burden" in showing that the political question doctrine applied. *Id.* at 560. To invoke the political question doctrine, the Fifth Circuit held that a private contractor must show: (1) that the claims against it would require a reexamination of a decision by the military; and (2) that the military decision at issue is insulated from judicial review. This case, like *Ibrahim* and *Lane*, involves an action against private defense contractors, not the government. Therefore, The Experts and HPES face a "double

burden" in dismissing Mr. Proctor's claims pursuant to the political question doctrine. Defendants cannot meet this burden.

This case does not involve any issues that are constitutionally committed to any other branch of government because no alleged negligent acts or omissions by the Defendants required any military judgment, reasoning or input. Simply put, Mr. Proctor alleges that Defendants knew or should have known that Alexis was capable of harming others and were negligent in retaining him and failing to adequately supervise him. Comp. ¶¶ 95-98. As a private contractor, the Defendants are neither a branch of the United States nor a part of the military. The decision to retain Alexis following his troubling behavior, of which Defendants were aware, required no military strategy or judgment. Alexis' massacre did not occur on foreign soil or involve any issues of military strategy. The acts that put Defendants on notice of Alexis' potential to harm others also occurred in the United States.

Defendants cannot argue that Mr. Proctor's allegations would require the judiciary to impede any function committed to the executive branch. As stated in *Baker*, one of the six factors must be *inextricable* from the issues in this case for the political question doctrine to apply. In fact, when faced with an "ordinary tort suit," the textual commitment factor actually weighs in favor of resolution by the judiciary. *Lane v. Halliburton*, 529 F.3d 548, 560 (5th Cir. 2008). Here, there was nothing unique to the executive branch or the military about private defense contractors' failure to supervise an employee to prevent him from harming others. Even assuming this case did involve decisions of the military branch, "not even military judgments are completely immune from judicial review." *McMahon*, 502 F.3d at 1358.

The Experts rely upon *Schneider v. Kissinger* in support of applying the political question doctrine. The Experts' Mem. at 15-16. In *Schneider*, this Court held, "it is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the

29

role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005). *Schneider* has nothing to do with the instant case. There, in a matter intertwined with Cold War decision-making, a former National Security Advisor and the United States itself were sued for the alleged murder and torture of a Chilean general in 1970. *See id.* The Court of Appeals found that the case challenged foreign policy decisions over which the courts have no authority. *Id.* Here, Mr. Proctor is suing private parties for their failure to supervise their employee. The Experts' job duties under the subcontract including refreshing and updating the Navy's computer program systems. Mr. Proctor has not alleged, nor is there any evidence, that The Experts performed any tasks that required military or executive branch judgment.

The Experts also cite *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009) to support dismissal of Mr. Proctor's regular negligence claims pursuant to the political question doctrine. In *Carmichael*, the plaintiff's husband, a U.S. Army sergeant, was injured while serving as an armed escort for a large military convoy traveling through a war zone in Iraq. *Id.* This case is completely different from *Carmichael*. Mr. Proctor's son was not a soldier attacked by enemies on foreign soil in the theatre of war. Mr. Proctor's son was murdered by private contractors' own employee. Unlike *Carmichael*, this case does not involve "difficult military conditions" or the military's judgment. Also, *Carmichael* did not involve negligent hiring, supervision, and retention claims. The defense contractor in *Carmichael* had little control over the enemy combatants who attacked the convoy and *Carmichael's* husband. Here, Defendants exercised control over Alexis' ingress to and egress from government buildings and were responsible, in part, for his actions.

The Experts further challenge Mr. Proctor's claims for negligence that arise under NISPOM. The Experts' Mem. at 16-22. NISPOM is promulgated as Department of Defense policy

and requires The Experts and HPES to develop and maintain a program that ensures all relevant derogatory information regarding cleared personnel is forwarded for consideration in the personnel security clearance determination process. Comp. ¶¶ 17-19. Mr. Proctor alleges that Defendants failed to recognize, investigate and report to the Department of Defense known adverse information about Alexis. Comp. ¶¶ 164-165.

Mr. Proctor's negligence claims for failing to report adverse information pursuant to NISPOM are not subject to the political question doctrine. Mr. Proctor is not asking the Court to determine the validity of NISPOM regulations or to second-guess the military's judgment with respect to security clearances. Mr. Proctor alleges that NISPOM regulations set the standard of care for Defendants' reporting of adverse information concerning Alexis. Adjudicating this case will not invalidate or affect the military's NISPOM regulations or require the Court to question the military's enactment of such regulations. Further, Mr. Proctor does not ask the Court to examine the military's strategy, or policies with respect to national security. Mr. Proctor's negligence claims solely require the Court to determine if Defendants followed the military's NISPOM guidelines. There is no issue in this case that is *inextricable* from a political question.

This Court should be guided by *McMahon v. Presidential Airways*, Inc., 502 F.3d 1331 (11th Cir. 2007). In *McMahon*, three United States army soldiers died when an airplane that was transporting them crashed into the side of a mountain in Afghanistan. *Id.* The plane was owned and operated by defense contractors. *Id.* The soldiers' survivors filed wrongful death actions against the companies, and they defended the action, in part, using the political question doctrine. *Id.* The plaintiffs alleged that the contractors breached Department of Defense regulations, which required the defense contractors to "develop and implement a commercial quality control plan to ensure safe and reliable air transportation," among other requirements for safety. *Id.* at 1336.

31

In declining to apply the political question doctrine, the Eleventh Circuit ruled that the case was "one step removed" from other cases in which the political question was applied because the action was not against any branch of the United States government. *Id.* at 1359. The Eleventh Circuit also looked at the Department of Defense guidelines for common carriers. The court determined that the defense contractor, "and not DOD was ultimately responsible for ensuring that the flights it provided were operated in a reasonably safe manner." *Id.* at 1361. Even though the deaths occurred in the theatre of war, the Eleventh Circuit concluded that the political question doctrine was not implicated because it was not evident that the plaintiff's allegations related to any "discrete areas of military responsibility." *Id.* The court also noted that the motion-to-dismiss phase of litigation, when almost no discovery had been completed, was too early to determine whether resolution of the case would require the court to decide a political question. *Id.* at 1365.

Like the plaintiffs in *McMahon*, Mr. Proctor attempts to hold Defendants – not the military – to standards promulgated in Department of Defense regulations. Mr. Proctor does not ask the Court to question the Department of Defense's adverse information reporting requirements or any guidelines for security clearances. Mr. Proctor seeks to hold private contractors responsible for violating Department of Defense regulations. Also, like *McMahon*, no discovery has been conducted. Therefore, at a minimum, it is too early determine whether resolution of Mr. Proctor's claims will require the Court to resolve a political question.

The Experts also broadly asserts that issues of national security and decisions concerning security clearances always invoke the political question doctrine. The Experts' Mem. at 18-20 (citing, e.g., *Dep't of Navy v. Egan*, 484 U.S. 518, 526–29 (1988); *Smith v. Halliburton Co.*, No. CIV.A. H-06-0462, 2006 WL 2521326, at *5 (S.D. Tex. Aug. 30, 2006); *Wilson v. James*, No. 13-CV-01351, 2015 WL 5952109, at *16 (D.D.C. Oct. 13, 2015)). However, as stated in *Stehney v. Perry*, 101 F.3d 925 (3d Cir. 1996), not all claims arising out of security clearance issues violate

32

the separation of powers or involve political questions. In *Stehney*, the plaintiff asserted that the

NSA violated her constitutional and regulatory rights in revoking her security clearance. *Id.* In

reviewing her claims, the Third Circuit held that the political question doctrine was not implicated

because the plaintiff sought review of "whether the NSA complied with ***its own regulations*** . . . ."

*Id.* at 932 (emphasis added). Here, Mr. Proctor's claims have even less involvement with

government and is another step removed from involving a political question. Mr. Proctor alleges

that ***private contractors, not the government***, failed to follow Department of Defense regulations.

The Experts also rely heavily on *Dep't of Navy v. Egan* to support its contention that Mr.

Proctor's claims involving NISPOM reporting regulations implicate the political question

doctrine. *See, e.g.,* The Experts' Mem. at 18. However, in *Egan* the plaintiff asked the court to

question the validity of the revocation of a security clearance. *Egan*, 484 U.S. at 526–29. Here,

Mr. Proctor alleges that The Experts and HPES failed to report adverse information, not that they

failed to revoke his security clearance. Even if Mr. Proctor had directly questioned Alexis' receipt

of a security clearance, since *Egan*, the Supreme Court and several courts of appeals have

determined that federal courts have jurisdiction to review certain claims arising from the clearance

revocation process. *Stehney*, 101 F.3d at 932 (citing *Webster v. Doe*, 486 U.S. 592, 603-04, 100 L.

Ed. 2d 632, 108 S. Ct. 2047 (1988)); *see also National Fed'n of Fed. Employees v. Greenberg*, 299

U.S. App. D.C. 261, 983 F.2d 286, 289-90 (D.C. Cir. 1993). "It is simply not the case that all

security-clearance decisions are immune from judicial review." *Greenberg*, F.2d at 289.

### (2)   There are Judicially Discoverable and Manageable Standards for Resolving Mr. Proctor's Negligence Claims

The second *Baker* factor is implicated where a plaintiff's claims require the Court to

resolve military judgments outside of the Court's competence. *McMahon*, 502 F.3d at 1363. This

factor is recognition that "courts are fundamentally underequipped to formulate national policies

or develop standards for matters not legal in nature." *Lane*, 529 F.3d 548, 562 (5th Cir. 2008). The Court's action on any issue "must be governed by *standard,* by *rule*." *Id.* at 560 (emphasis in original). Where "familiar judicial techniques are available" to resolve the issue, the second *Baker* factor is not implicated. *Burwell*, 2015 U.S. Dist. LEXIS 119712, *61 (declining to invoke the political question doctrine in a dispute between the U.S. House of Representatives and the Secretary of the U.S. Department of Health and Human Services).

In *Harris v. Kellogg, Brown & Root Servs.*, 618 F. Supp. 2d 400 (W.D. Pa. 2009), an army soldier in Iraq in January 2008 was electrocuted in the shower while using a shower facility maintained by the defendant defense contractor pursuant to a contract with the U.S. Army. The plaintiff alleged, in part, that the defense contractor negligently maintained the shower facility, which caused the electrocution. The court rejected the political question defense, finding that resolution of the plaintiff's claims would only require the court to use traditional principles of negligence law, not military judgment. *Id.* Here, there are discoverable and manageable standards in District of Columbia common law and NISPOM regulations that allow the Court to hear plaintiff's claims without using military judgment.

Like *Harris*, this case is an "ordinary tort suit seeking money damages against a private corporation." *Id.* at 427. Mr. Proctor's negligent hiring, retention, and supervision claims can be resolved without questioning any military decisions or policies. "The flexible standards of negligence law are well-equipped to handle varying fact situations." *Id.* (quoting *McMahon*, 502 F.3d at 1364 (footnote omitted)). Also, like the factual scenario in *McMahon*, this case "does not involve a *sui generis* situation such as military combat or training, where courts are incapable of developing judicially manageable standards." *McMahon*, 502 F.3d at 1364. Instead, this case involves a determination of whether Defendants knew or should have known Alexis had a violent past and, therefore, were negligent in deciding to hire and retain Alexis despite his troubling

history. "It is well within the competence of a federal court to apply negligence standards" to this

factual situation. *McMahon*, 502 F.3d at 1364.

While this case involves a defense contractor, this Court can still apply ordinary negligence

standards to determine whether the Defendants were negligent in hiring retaining or supervising

Alexis. In *Harris*, the court recognized that the standard of care to be applied raised unique issues

and that providing maintenance services at a military base in Iraq is different than providing such

services in a civilian facility. *Id.* at 428. The court still concluded that such differences did not

make the case nonjusticiable. *Id.* In *McMahon*, the Eleventh Circuit made the same observation:

> We readily acknowledge that flying over Afghanistan during wartime is different
> from flying over Kansas on a sunny day. But this does not render the suit inherently
> non-justiciable. While the court may have to apply a standard of care to a flight
> conducted in a less than hospitable environment, that standard is not inherently
> unmanageable.

*McMahon*, 502 F.3d at 1363. Although Mr. Proctor's negligent hiring, retention, and

supervision claims involve unique issues because of Alexis' employment with a defense

contractor, such issues do not preclude the Court's resolution of this matter.

This case is dissimilar to *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402 (4th

Cir. 2011), a case upon which Defendants rely. In *Taylor*, the same defense contractor from *Harris*

was sued, again, for an injuries sustained from an electric shock allegedly caused by the

contractor's negligence. The Fourth Circuit determined that the political question doctrine was

implicated because the court had no standards for evaluating who should be authorized to work on

generators supplying power to a military base, and "any such judicial assessment thereof would

show a lack of respect for the executive branch." *Id.* at 412, n.13. This logic does not apply to this

case. Here, an ordinary negligence standard applies to Mr. Proctor's negligent hiring, retention,

and supervision claims. No military judgment or standards are required in order to resolve Mr.

Proctor's claims. Defendants' decisions to hire and retain Alexis, and their failure to properly supervise him, did not involve any military strategy and did not occur in the theatre of battle.

In an attempt to side-step these facts and entangle the Defendants' negligence with the government's actions, The Experts incorrectly states that "[t]he Navy was in the only position to know and report the conduct on which plaintiffs rely in their efforts to meet the heightened foreseeability standard." The Experts' Mem. at 27. A consistent refrain throughout Defendants' briefs is that the Navy is responsible for the great tragedy at the Washington Navy Yard on September 16, 2013. The Experts even called the Navy "the elephant in the room (but not in the caption)." The Experts' Mem. at 1.

First, Mr. Proctor has alleged that *private corporations, not the government,* were negligent. Defendants cannot shift the blame to the Navy when it knew that Alexis displayed troubling activity in the month prior to the shooting. *Id.* at ¶ 96. Alexis' behavior was so disturbing that The Experts' travel coordinator expressed concern that he would harm others. *Id.* The Department of Defense report states: "before September 16th, Alexis *was observed by several people, including his supervisors at The Experts, Inc. and HP Enterprises Services LLC, to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others*." Comp. ¶ 98 (emphasis in original).

Second, the District of Columbia does not use a proportional liability system that assigns liability based on fault. *Faison v National Mortgage Corp.*, 839 F. 2d 680, 686 (D.D.C. 1987). The District of Columbia has a joint and several liability system through which Mr. Proctor can obtain all of his relief solely from the military contractors, thereby obviating the need to re-evaluate any of the government's decisions. *Emmert v U.S*, 300 F. Supp. 45 (D.D.C. 1969). Under federal law, this case is justiciable where the plaintiff does not seek any relief that implicates the proportional liability system. *Harris v. Kellogg Brown & Root Servs.*, 724 F.3d 458, 474 (3d Cir. 2013). In

*Harris*, the Third Circuit said, "if a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticiable issue." *Harris*, 724 F.3d at 474. The logical converse of that statement is that proximate cause defenses do not invoke the political question doctrine in joint and several liability jurisdictions.

There are also judicially discoverable and manageable standards for resolving Mr. Proctor's negligence allegations premised upon Defendants' violations of NISPOM regulations. Mr. Proctor alleges that Defendants had a duty pursuant to NISPOM regulations to report adverse information to the Department of Defense and failed to do so. *See, e.g.,* Comp. ¶ 164. NISPOM defines adverse information as "any information that adversely reflects on the integrity or character of a cleared employee, that suggests that his or her ability to safeguard classified information may be impaired, or that his or her access to classified information clearly may not be in the interest of national security." DoD 522.22-M; *Duvall v. Honeywell Techs. Sols., Inc.*, Civil Action No. 9:06-3544-CWH, 2008 U.S. Dist. LEXIS 9166, at *4 (D.S.C. Feb. 6, 2008). Because the Department of Defense has established clear NISPOM guidelines and definitions, the Court has manageable standards for resolving the issues in the case.

### (3)   The Court Can Resolve the Issues Without Expressing a Lack of Respect for the Executive Branch

This *Baker* factor is implicated where the matter at issue "has been discussed and debated" by another branch of the government. *See, e.g., Bancoult v. McNamara*, 370 F. Supp. 2d 1, 16 (D.D.C. 2004). It also applies where the court cannot resolve the issue without condemning another branch of government. *Id.*

The Experts compares this case to *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991), which is inapplicable here. In *Tiffany*, a pilot's estate sued the United States when the pilot was killed in a crash with an intercepting Air Force jet. *Id.* The Fourth Circuit held that the suit was

37

barred by the political question doctrine because "the decisions whether and under what circumstances to employ military force are constitutionally reserved for the executive and legislative branches." *Id.* at 277. Specifically, the Fourth Circuit stated that the "strategy and tactics employed on the battlefield are clearly not subject to judicial review." *Id.*

The Experts also cite *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) in support of dismissal. In that case, the Eleventh Circuit held that the first *Baker* factor applied to certain decisions concerning training made by the U.S. military. *Aktepe* involved an accident that took place during a joint training exercise involving both the Turkish and U.S. navies. *Id.* A U.S. ship accidentally fired a live missile at one of the Turkish ships, resulting in several deaths and numerous injuries. *Id.* at 1402. The injured Turkish sailors (and the survivors of those who died) sued the United States under the FTCA.

This case is completely dissimilar to *Tiffany* and *Aktepe.* Here, Mr. Proctor is not suing the United States or any branch of the government. Mr. Proctor is not questioning any policy or actions of the military. Also, while *Tiffany* and *Aktepe* involved military action, this case does not. In *McMahon*, the Eleventh Circuit further distinguished *Aktepe* and *Tiffany*, holding that cases against private contractors are "one step removed" from those against the government and less likely to invoke the political question doctrine. *McMahon*, 502 F.3d at 1359.

### (4)   None of the Other *Baker* Factors Apply to Mr. Proctor's Claims

The remaining *Baker* factors are: (1) the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion; (2) an unusual need for unquestioning adherence to a political decision already made; and (3) the potentiality of embarrassment of multifarious pronouncements by various departments on one question. *Baker*, 369 U.S. at 217.  None of these factors apply.

First, as stated above, there are judicially discoverable and manageable standards for resolving the issues in this case. The Court will not have to make a policy decision that is "reserved to the discretion of the political branches." *Lane v. Halliburton*, 529 F.3d at 563. Mr. Proctor alleges that the Defendants breached the common law duty of using reasonable care in hiring, retaining and supervising Alexis. Mr. Proctor further alleges that Defendants violated Department of Defense guidelines. Mr. Proctor's claims do not require the Court to question the wisdom of such guidelines, or any military policies.

Second, there is no "unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217. Again, Mr. Proctor is not attempting to invalidate or question the regulations set by the Department of Defense. Mr. Proctor only asks the Court to determine whether private defense contractors adhered to such regulations and the ordinary standard of care pursuant to District of Columbia law.

Lastly, there is no potential for "embarrassment of multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. Mr. Proctor's claims do not involve second-guessing pronouncements or policy decisions by the military or executive branch. Mr. Proctor's allegations concern the actions and omissions of private defense contractors.

**V.      Mr. Proctor Alleges Valid Vicarious Liability Claims for Assault and Battery**

The Experts and HPES argue that Mr. Proctor's claims for assault and battery fail as a matter of law because they cannot be held vicariously liable for intentional torts committed by Alexis. The Experts' Mem. at 40-42; HPES' Mot. at 34-36. Defendants overlook the fact that Mr. Proctor seeks to hold Defendants vicariously liable for Alexis' acts through theories of agency in the aid of execution and apparent authority. *See, e.g.,* Comp. ¶¶ 196 – 221.

RESTATEMENT (SECOND) OF AGENCY § 219(2)(d), states, "A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless . . . the

servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Thus, Section 219(2)(d) of the Restatement permits two varieties of vicarious liability: (1) apparent authority; and (2) aid in the agency of execution. Negligence claims under this Section of the Restatement were examined by this Court in *Doe v. Sipper*, 821 F. Supp. 2d 384, 390-92 (D.D.C. 2011), a case handled by undersigned counsel. In *Doe*, the plaintiff was a new part-time employee of the defendant New Leaf Brands, Inc. *Id.* at 386. After working at a trade show as a spokesmodel for New Leaf (a beverage company), the plaintiff attended a group dinner with co-workers and the company's Chief Operating Officer ("COO"), William Sipper. *Id.* Mr. Sipper, using his position as COO, invited the plaintiff to his hotel room to book airline tickets for other upcoming trade shows. *Id.* The plaintiff fell asleep in his room and later woke up to find Mr. Sipper raping her. *Id.* This Court applied Section 219(2)(d) of the RESTATEMENT OF AGENCY in denying the defendant's motion to dismiss with respect to the agency in the aid of execution claim. *Id.* at 393.

This Court held that vicarious liability through agency in the aid of execution holds an employer liable where the employee's tort was "accomplished by an instrumentality, or through conduct associated with the agency status." *Id.* at 392. The Court stated that the aid in agency of execution theory could apply, for example, to a telegraph operator sending a false message or a store manager cheating a customer. *Id.* (citing *Barnes v. Costle*, 561 F.2d 983, 996, 183 U.S. App. D.C. 90 (D.C. Cir. 1997)). This case fits into the rubric for agency in the aid of execution claims as established in Section 219(2)(d) of the Restatement and clarified further in *Doe v. Sipper*.

Here, Mr. Proctor alleges that "Alexis was aided in the commission of his violent acts through an instrumentality of his agency or through conduct associated with his agency status as an employee of The Experts and as a subcontractor to HPES." *Id.* at ¶¶ 203, 214. Mr. Proctor also alleges that "but for the building pass provided and visit scheduled by The Experts and/or HPES,

Alexis would not have been able to commit his act." *Id.* at ¶¶ 204, 217. Mr. Proctor's allegations, which must be accepted as true, clearly meet the standard for an agency in the aid of execution theory of vicarious liability established in the RESTATEMENT (SECOND) OF AGENCY § 219(2)(d) and *Doe v. Sipper*.

Mr. Proctor also seeks to hold Defendants liable through an apparent authority theory. Mr. Proctor alleges that "Alexis used his apparent authority as an employee of The Experts and as a subcontractor to HPES to enter the Washington Navy Yard and carry out his attack." Comp. ¶¶ 201, 212. In *Doe v. Sipper*, this Court rejected the plaintiff's apparent authority theory of liability because the defendant could not have purported to act or to speak on behalf of his employer while assaulting her. *Doe*, 821 F. Supp. 2d at 391. This case is different from *Doe* in that regard. Here, Alexis was able to commit mass murder at the Navy Yard only through the authority Defendants provided to him. Comp. at ¶¶ 204, 217. Had Defendants not given Alexis access to the Navy Yard based on his violent and bizarre behavior, Alexis would not have harmed anyone at the Navy Yard.

Defendants fail to cite *Doe v. Sipper*, or any other District of Columbia case, concerning agency in the aid of execution or apparent authority. Mr. Proctor alleges sufficient facts pursuant to District of Columbia law to state claims of vicarious liability against Defendants under both theories.

## VI.    NISPOM Imposes a Duty of Care on The Experts and HPES

The Experts and HPES argue that Mr. Proctor's negligence claims premised upon Defendants' violations of NISPOM fail because they did not owe Plaintiffs or Plaintiffs' decedents a duty to protect their physical security under NISPOM because NISPOM was not designed to prevent the harm alleged. The Experts' Mem. at 29; HPES' Mot. at 24-32. Defendants are

41

incorrect because NISPOM was designed in the interests of national security generally and was incorporated into regulations specifically designed to prevent workplace violence.

To prevail on a negligence per se theory, the plaintiff may rely on a statute or regulation as proof of the applicable standard of care. *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039 (D.C. 2014). Violations of a statute or regulation may constitute negligence per se where: (1) the statute is meant to promote safety; (2) the plaintiff is a member of the class to be protected by the statute; (3) the defendant is a person upon whom the statute imposes specific duties; and (4) the statute or regulation must set forth specific guidelines to govern behavior. *Id.* Pursuant to these guidelines, Mr. Proctor's allegations are sufficient for a negligence per se claim premised upon NISPOM.

NISPOM is contained in Department of Defense Directive 5220.22 and establishes the requirements and procedures for the National Industrial Security Program.[5] NISPOM provides baseline standards for the protection of classified information released or disclosed to industry in connection with classified contracts under the National Industrial Security Program. *Id.* NISPOM required The Experts and HPES to report adverse information coming to their attention concerning any of their cleared employees. *Id.*; *see also Ford v. Torres*, No. 1:08cv1153 (JCC), 2009 U.S. Dist. LEXIS 57245, at *31 (E.D. Va. Mar. 3, 2009). In addition, all government agencies, including the Department of the Navy, were tasked to adopt "insider threat programs" specifically applicable to "industrial or commercial contractors . . . including subcontractors" pursuant to SECNAVINST 5510.37: DON Insider Threat Program.[6] Furthermore, SECNAVINST was designed to "deter, detect and mitigate" insider threats ("the threat of harm from sabotage or workplace violence") incorporated the duty of contractors under NISPOM to report such insider

---

[5] Available at http://www.dss.mil/documents/odaa/nispom2006-5220.pdf.

[6] Available at http://fas.org/irp/doddir/navy/secnavinst/5510_37.pdf.

threats to the government via the JPAS communication system. *Id.* NISPOM also repeatedly uses phrases such as "personnel security" and "national security."

While NISPOM's superficial goal is to prevent data breaches, the ultimate policy concern is to protect the safety of Americans and American interests. NISPOM, when read in conjunction with SECNAVINST 5510.37, evinces a clear concern with "insider threats" and "workplace violence." NISPOM's reporting requirements were not only designed to prevent data breaches, but also prevent violence of the kind perpetrated by Alexis as alleged in this case. Additionally, NISPOM governed Defendants and provided specific guidelines to promote safety. Therefore, Mr. Proctor's allegations meet the requirements for a negligence per se claim in this instance.

## VII.   CONCLUSION

No discovery has taken place, but Mr. Proctor and the other Plaintiffs have gathered significant evidence demonstrating that Defendants knew, or should have known, that Alexis was likely to harm others. The Experts' own employee expressed fear that Alexis would cause harm to others. The Department of Defense also concluded that Defendants knew, or should have known, that Alexis was going hurt someone. Mr. Proctor's factual allegations must be accepted as true at this stage of litigation and any contrary assertions by the Defendants should be ignored.

Defendants' various legal positions are also untenable. The heightened foreseeability standard is not applicable to Mr. Proctor's negligent hiring, retention, and supervision claims. Even if it were, the heightened foreseeability standard does not require Mr. Proctor to allege, down to the last detail, that Defendants were aware Alexis was going to commit mass murder in the Navy Yard. Mr. Proctor need only show that Alexis had the potential to be violent towards others. Regardless of the specificity required, Mr. Proctor has alleged sufficient facts at this stage of litigation concerning Defendants' knowledge of Alexis' potential to commit murder.

Furthermore, the political question doctrine does not apply because Mr. Proctor has not asked the Court to question Department of Defense policies or military strategy. In addition, Mr. Proctor can hold Defendants liable for Alexis' intentional acts through apparent agency and agency in the aid of execution theories of liability. Finally, Mr. Proctor may premise his negligence claims on Department of Defense regulations. Such regulations were enacted in the interests of national security, generally, and to prevent harm to Americans. Therefore, Defendants' violations of such regulations may form a basis for a negligence per se claim.

For all of the above-stated reasons, Defendants' Motions to Dismiss must be denied. Alternatively, should the Court be inclined to consider granting the Motions to Dismiss, Plaintiff requests that the Court stay the Motions (which are thinly-veiled motions for summary judgment) and permit Plaintiff to conduct discovery as set forth in the accompanying discovery declaration.

Respectfully submitted,

Peter C. Grenier (DC Bar No. 418570)
Peter T. Anderson (DC Bar No. 989536)
Stan M. Doerrer (DC Bar No. 502496)
Grenier Law Group PLLC
1400 L Street, N.W., Suite 420
Washington, D.C. 20005
*Counsel for Plaintiff, John Edward Proctor*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of February, 2016, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to counsel of record in this case, including:

> Jason C. Raofield, Esquire
> Counsel for Defendant HP Enterprise Services, LLC
> Covington & Burling LLP
> One CityCenter
> 850 Tenth Street, N.W.
> Washington, DC 20001-4956

> Jeffrey E. McFadden, Esquire
> Counsel for Defendant The Experts, Inc.
> Stradley Ronon Stevens & Young, LLP
> 1250 Connecticut Avenue, N.W., Suite 500
> Washington, DC 20036-2652

Peter C. Grenier (DC Bar No. 418570)